v.

**STATE of Alaska, Appellee.**

**No. S–4969.**

Supreme Court of Alaska.

July 23, 1993.

---

Jacqueline Bressers, Anchorage, for appellant.

Steven D. DeVries, Asst. Atty. Gen., Anchorage and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MOORE, Chief Justice.

In this Child In Need of Aid (CINA) proceeding, Mr. N. appeals the superior court's order terminating his parental rights. We find substantial evidence in the record supporting the court's decision and affirm.

### I. *Facts and Proceedings*

A. *Background History*

The N. family has had a troubled history. Ms. N., a native Alaskan, is an alcoholic who often leaves the family home for extended periods of time. Mr. N. has a history of mental instability which dates back to his discharge from the Air Force for mental health reasons.

The Department of Family and Youth Services (DFYS) became involved with the N. family in April 1987 after Mr. N. was arrested for disorderly conduct, leaving no parent available to care for the couple's first child, J.N. DFYS instituted CINA proceedings and J.N. was subsequently adjudicated a child in need of aid.[1] Although a DFYS caseworker expressed concern over the lack of stability in the home, the case was dismissed in September 1987 because there had been no further instances of neglect.

Shortly after the birth of the N.'s second child, K.N., Jr., in November 1987, both children were adjudicated children in need of aid after Mr. N. was arrested for disorderly conduct a second time. The court placed the children in the legal custody of DFYS but returned physical custody to the parents. The court also ordered both Mr. N. and Ms. N. to participate in counseling, to use homemaker services provided by DFYS and to place the children in Intermission[2] rather than leave them unattended.

Pre-disposition reports identified Ms. N.'s alcohol abuse as a major cause of the family's problems and underlined her failure to participate in an alcohol treatment program and counseling as ordered by the court. Both the social worker, Buffy Gullberg–Williams, and the guardian ad litem, Colleen Ray, recommended that the children be placed with Mr. N. After a disposition hearing in May, the court returned the children to the physical custody of Mr. N. The court also ordered Mr. N. to continue his VA counseling and to use homemaker services to help him develop single parenting skills. Later that summer, the N.'s youngest child, N.N., was born.

Gullberg–Williams visited Mr. N.'s home one to four times a week after the court returned physical custody to Mr. N. She described Mr. N. as very loud and rigid in his views (especially regarding the police), but she never observed any delusional behavior. She noted that Mr. N. was rigid but not inappropriate in his treatment of the children. Finally she observed that although Mr. N. followed the treatment plan, he resented DFYS involvement and was not completely cooperative. Because she observed no child protection issues, le-

---

1. AS 47.10.010(a)(2)(A) provides, in part, that the court may find a child in need of aid when there is "no parent, guardian, custodian, or relative caring or willing to provide care."

2. Intermission is a community program which provides child care to eligible parents for respite purposes.

gal custody was returned to Mr. N. in January 1989 at DFYS's request.

DFYS kept in contact with Mr. N.'s family but did not make any further home visits. In the spring of 1989, Mr. N. entered into a voluntary placement program with DFYS to enable him to work. He also used other community resource programs such as Intermission. In February 1989, J.N. participated in the Head Start program, which ended when Mr. N. displayed inappropriate and threatening behavior to staff members.

### B. *Facts leading to final CINA petition*

On April 24, 1990, Mr. N. drove his three children, J.N. (age four), K.N., Jr. (age three) and N.N. (age two), to Westchester Lagoon after having a fight with his girlfriend. According to Mr. N.'s statement to the police, he let the children out to play while he worked on his stereo, put gasoline in the car tank and practiced Kung–Fu. He stated that he first realized that his youngest son was missing when K.N., Jr. asked him about N.N. After looking around the area, Mr. N. concluded that someone had kidnapped his son.

Mr. N. then took J.N. and K.N., Jr. to DFYS's Anchorage office around 4:30 in the afternoon. Highly agitated, he left his children with a caseworker, shouting, "You took my one kid, now you're going to ... take my other two...." He then returned to the lagoon with his girlfriend and went to the Anchorage Daily News with a picture of N.N. The Daily News staff called the police about an hour after N.N. had disappeared. N.N.'s body was later discovered in the lagoon.

### C. *Pre-adjudication Proceedings*

Following N.N.'s death, DFYS filed its final CINA petition. After a four-day temporary custody hearing,[3] Judge John Reese directed DFYS to take temporary legal and physical custody of J.N. and K.N., Jr. The court also ordered Mr. N. to have no contact with the children unless authorized by DFYS. Finally, the court found that DFYS had made active, albeit unsuccessful, efforts to prevent the break-up of the family before placing the children in foster care.

At the July interim review hearing, social worker Thomas Garlock testified that Mr. N. had told him that he wanted his children back and would do whatever necessary. However, Garlock also stated that Mr. N. was very reclusive and had not initiated any contact with DFYS. The court ruled that all previous orders would remain in effect and again found that DFYS was making reasonable efforts to reunite the family.

At the August review hearing, DFYS informed the court that both J.N. and K.N., Jr. were in counseling and that DFYS was seeking a psychiatric evaluation of Mr. N. DFYS also noted that it was evaluating possible placement of the children with Mr. N.'s relatives in Ohio. The court again found that DFYS was making reasonable efforts to reunite the family.

In September DFYS filed a written case treatment plan for Mr. N. This plan identified three objectives. First, DFYS sought an updated psychological assessment of Mr. N. and required Mr. N. to follow any recommendations the examining psychologist might have. Once Mr. N. had made initial progress in individual therapy, DFYS planned to initiate family therapy in order

---

**3.** At the hearing, the Department presented the testimony of three witnesses. Denise Albee, J.N.'s foster mother, testified to spontaneous statements J.N. made to her in the days following N.N.'s death. J.N. repeatedly told her that "Daddy put N.N. in the water with the ducks." Albee also testified that J.N. said that Mr. N. had hit and choked her when she told him that N.N. was in the water.

The social worker assigned to the case, Thomas Garlock, stated his opinion that visitation with Mr. N. would be detrimental to both chil-

dren. He based his opinion on Albee's testimony and Mr. N.'s emotional state when he dropped the children off at DFYS's office on the day of the tragedy.

Officer Reeder testified that before J.N. knew that N.N. had been found in the lagoon, she told him that her father had put N.N. in the water because N.N. got his feet wet. Audiotapes of Officer Reeder's talks with J.N. were played into evidence. He also testified that Mr. N. displayed bizarre and erratic behavior during the police investigation.

to work toward DFYS's second stated objective—allowing Mr. N. visitation with the children. The final objective—helping Mr. N. develop a consistent and stable home environment—was to be implemented by providing Mr. N. with homemaker services once visitation had been established and by requiring Mr. N. to participate in parenting classes.

In November DFYS filed a Motion for a Psychological and Psychiatric Examination after Mr. N. failed to sign the proposed treatment plan. Mr. N. opposed this request on the grounds that DFYS was seeking this evaluation with a view to terminate his parental rights rather than to reunite him with his family. Superior Court Judge Peter Michalski granted DFYS's motion on November 14, 1990.

Despite this order, Mr. N. refused to obtain a psychiatric or psychological evaluation until DFYS moved for sanctions. Doctor Gregory McCarthy ultimately evaluated Mr. N. during two sessions in March 1991.

D. *Adjudication Trial*

At the three-day adjudication hearing in March, Officer Reeder reiterated his earlier testimony concerning his investigation of N.N.'s death and J.N.'s statements about the tragedy (that her father had put N.N. in the water because N.N. had gotten his feet wet). Denise Albee, J.N.'s foster mother, also testified to J.N.'s similar unsolicited statements to her. Albee also testified that J.N. had told her of several incidents where Mr. N. had hit the children. On cross-examination, Albee confirmed that J.N. had also given other explanations of the tragedy and that she no longer said that her father had put N.N. in the water.

J.N.'s therapist, Christy Williams, testified that, in her expert opinion, J.N. had suffered numerous episodes of traumatic stress in addition to N.N.'s death and that these episodes were related to Mr. N.'s inappropriate parenting (i.e. excessive discipline and anger). She stated that it would

be contrary to J.N.'s best interests to have any contact with Mr. N. until he could understand the impact his behavior had had on J.N. She stated that J.N. was afraid of her father and did not want to see him.[4]

Doctor Gregory McCarthy, qualified as an expert in clinical psychiatry, testified at length concerning his evaluation of Mr. N. He stated that his opinion was based primarily on his clinical evaluation of Mr. N., but that he also had relied on the referral materials provided by DFYS. Dr. McCarthy noted that Mr. N. demonstrated paranoia in his thinking and ideas of reference, reality distortion, and looseness of association. He stated that Mr. N. denied having any psychiatric problems and projected blame for his problems onto others. According to Dr. McCarthy, these symptoms were consistent with a diagnosis of paranoia or paranoid schizophrenia.

Dr. McCarthy observed that there is no cure for paranoid schizophrenia, which is characterized by slow mental deterioration. He expressed his opinion that Mr. N.'s mental condition had deteriorated significantly in the last few years and that his prognosis was poor. In his view, Mr. N. would have to be stabilized by appropriate medication before therapy could possibly help him. However, he expressed pessimism that Mr. N. would follow through consistently with either counseling or medication.

Although Dr. McCarthy emphasized that he had never seen Mr. N. interact with his children, he believed that it would be very difficult for a young child to grow up with a parent as psychotic as Mr. N.

Gary Muromoto, a social worker at the VA hospital, testified that Mr. N. had been attending counseling at the VA since 1984 but that he had stopped in November 1989. Muromoto stated that Mr. N.'s treatment issues were still unresolved at that time.

Mr. N. presented the testimony of social workers who had worked with his family during the 1988–89 adjudication proceedings. These professionals observed that

4. DFYS also presented the testimony of a number of persons who had witnessed Mr. N. exhibiting inappropriate behavior toward his children.

they had never seen Mr. N. use inappropriate discipline and that they had considered the children safe with Mr. N. at that time. Several friends of Mr. N. also testified that he treated the children appropriately.

In her written closing statement, Kathleen Wilson, the guardian ad litem, expressed her pessimism regarding "[Mr. N.'s] desire and ability to undertake treatment, given his paranoia, hostility, and need for medication." Although she recognized that, in the past, Mr. N. had been a "conscientious and caring parent," she did not believe that Mr. N. could be relied on "to maintain a mental state sufficiently stable ... to enable him to be an adequate caregiver."

On April 2, 1991, the court adjudicated J.N. and K.N., Jr. as children in need of aid, by clear and convincing evidence, pursuant to AS 47.10.010(a)(2)(A), (C), and (F).[5]

### E. Subsequent Proceedings

At a May review hearing, Ms. N. reappeared and asserted her desire to be reunited with her children.[6] The court again found that DFYS was making reasonable efforts to reunite the family.

In June 1991 Mr. N. telephoned the Anchorage Daily News and talked to the night editor, Andrew Ryan, about DFYS's involvement with his children. Concerned by the nature of Mr. N.'s comments, Ryan reported this call to the police department. As a result DFYS decided that the children were not safe in their present location and moved them to a new foster home. This placement was unsuccessful. DFYS then decided to place them with Mr. N.'s relatives in Ohio. Mr. N. opposed DFYS's motion for out-of-state placement and requested a placement review hearing.

At the placement hearing, Christy Williams, the children's therapist, testified that J.N. still expressed fear of her father and needed a stable environment. In her view, J.N.'s fears were related to excessive discipline which was abusive.

Williams testified that in therapy K.N., Jr. had expressed more positive feelings about his father. However, she also testified that K.N., Jr. exhibited symptoms of fetal alcohol syndrome which increased his need for a stable and permanent environment.

Finally Williams stated her opinion that Mr. N. could not meet these needs as a single parent given his diagnosed mental problems. She concluded that a permanent family placement would be in both children's best interests.

The social worker assigned to the case, Brianne Surrey, testified that Mr. N. had discontinued visitation with K.N., Jr. in February 1991 and had discontinued his parenting classes. In June and July, Surrey talked to Mr. N. about his treatment plan and Dr. McCarthy's recommendations (possible hospitalization and medication) but Mr. N. maintained that he had been misdiagnosed and refused to take medication. Finally she testified that she had tried to set up a treatment plan with Mr. N., but that he had refused to cooperate.

Doctor Leon Janis, a VA psychiatrist, testified on Mr. N.'s behalf. Dr. Janis started seeing Mr. N. regularly in July 1991. In his opinion, Mr. N. suffered from a schizo-typal personality disorder, a condition less disabling than paranoid schizophrenia. He did not believe that Mr. N.'s condition required hospitalization, but recommended supportive therapy and medi-

**5.** These sections provide, in part, that a child may be found in need of aid when (1) there is no parent, guardian, custodian, or relative caring or willing to provide care (AS 47.10.010(a)(2)(A)); (2) the child has suffered or is in an imminent danger of suffering substantial physical harm as a result of the actions of or conditions created by the child's parent, guardian, custodian (AS 47.10.010(a)(2)(C)); and (3) the child has suffered substantial physical abuse or neglect as the result of conditions created by

the child's parent, guardian or custodian (AS 47.10.010(a)(2)(F)).

**6.** A hearing was held in May 1991 to determine whether Ms. N. could visit her children. After the hearing, Brianne Surrey, the social worker, discussed a treatment plan with Ms. N. and set up a June appointment for her to sign the plan and get the necessary referrals. Ms. N. did not appear at the appointment and has not been heard from since.

cation. He did not consider Mr. N. to be a danger to his children in a supervised setting, but admitted that Mr. N. could appear grossly psychotic at any time. In his own words, his assessment of Mr. N. differed more quantitatively than qualitatively from Dr. McCarthy's.

At the close of evidence, Judge Reese ruled, based on clear and convincing evidence, that contact between Mr. N. and his children would be harmful. In denying Mr. N.'s motion to prohibit out-of-state placement of the children, Judge Reese emphasized that the children needed a stable environment and observed that Mr. N. had voluntarily suspended visitation with K.N., Jr. The children were then placed with Mr. N.'s Ohio relatives.

### F. *Termination Trial*

In August 1991 DFYS filed a petition to terminate Mr. N.'s parental rights and a hearing was held in December.[7] At the termination trial, Valerie Miller, Mr. N.'s first cousin, testified that J.N. and K.N., Jr. had adjusted well to their new environment and that she and her husband hoped to adopt the children. She also stated that J.N. continued to express fear of Mr. N.

The children's therapist, Williams, reiterated her opinion that the children had special needs and that their need for stability, continuity and security was very great.

Dr. McCarthy testified that his diagnosis of Mr. N. was unchanged after reviewing Dr. Janis's testimony at the out-of-state placement hearing and Mr. N.'s current VA medical records. He characterized Mr. N. as actively delusional, extremely paranoid and unable to meet the needs of a young child. He reiterated his view that Mr. N.'s prognosis was poor, and concluded that lengthy treatment would be required to stabilize Mr. N.

Dr. Janis again testified on Mr. N.'s behalf. He had seen Mr. N. five times since the September hearing. He reiterated his earlier diagnosis of Mr. N. and his view that Mr. N.'s condition was not deteriorating. He testified that Mr. N. had agreed to take an anti-psychotic drug. However, he did not know if Mr. N. had started taking the medication.

Surrey, the social worker, reiterated by video deposition her earlier testimony that Mr. N. had refused to cooperate with his treatment plan or get a second psychological assessment. She testified that she first learned that Mr. N. was seeing Dr. Janis at the September hearing. She admitted that she never had tried to contact Dr. Janis concerning Mr. N. but stated that she would have worked to develop a new treatment plan if either Mr. N.'s attorney or Dr. Janis had contacted her.

At the close of trial, the trial court terminated Mr. N.'s parental rights. The court entered its written findings of fact and conclusions of law in December 1991. This appeal followed.

### II. *Discussion*

■ Before a court may terminate parental rights in an Indian child,[8] DFYS must prove:

(1) by clear and convincing evidence that the parental conduct that caused the child to be adjudicated a child in need of aid is likely to continue unless parental rights are terminated. CINA Rule 18(c)(1); *In re J.R.B.*, 715 P.2d 1170, 1172 (Alaska 1986).

(2) by evidence beyond a reasonable doubt that custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. CINA Rule 18(c)(2); 25 U.S.C. § 1912(f) (1983).

*e.g., In re Adoption of T.N.F.*, 781 P.2d 973 (Alaska 1989), *cert. denied, Jasso v. Finney*, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 616 (1990) (ICWA applied to adoption of child by Indian father and his wife, even though child's biological mother was not Indian).

---

7. The parties agreed that the court could consider all the testimony and evidence presented in earlier proceedings at the termination trial.

8. The ICWA requirements apply even when, as in this case, DFYS is seeking to terminate the parental rights of a non-Indian parent. *See,*

(3) by a preponderance of the evidence that the party requesting the termination of parental rights has shown that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break-up of the Indian family and that these efforts have proved unsuccessful. CINA Rule 18(c)(2); 25 U.S.C. § 1912(d).

On appeal, Mr. N. argues that the superior court erred in finding that DFYS had met its burden of proof on each of these requirements.[9] Mr. N. also maintains that ICWA requires DFYS to prove "beyond a reasonable doubt" that DFYS's active remedial efforts have been unsuccessful and that this higher burden of proof preempts the preponderance burden set forth in CINA Rule 18(c)(2).

■ The findings of the superior court in CINA cases will not be overturned unless this court, after reviewing the entire record, is left with a definite and firm conviction that a mistake has been made. *In re S.D., Jr.*, 549 P.2d 1190, 1195 (Alaska 1976).

A. *Did the superior court err in finding that Mr. N.'s inappropriate parenting is likely to continue?*

The trial court found by clear and convincing evidence that Mr. N.'s conduct, a product of his mental illness, was likely to continue, and indeed worsen, in light of the seriousness of his condition and the increasing stress of parenting his growing children. The court commented that

[Mr. N.'s] explosiveness, his tendency toward violence as well as his preoccupation with the paranoid delusional thoughts which allow him to neglect the children are all going to continue and in fact increase.

■ On appeal, Mr. N. contends that the evidence demonstrates that he could successfully parent his children given appropriate support services. Relying on Dr. Janis's expert testimony, he argues that his

condition is less severe than paranoid schizophrenia and that it has not deteriorated since 1988. He then concludes that the 1988–89 positive evaluations of his parenting capacity are compelling evidence of his future ability to parent.

On the record presented, we conclude that the court did not err in finding that Mr. N.'s inappropriate parenting was likely to continue. At the termination trial, Dr. McCarthy stated that even after reviewing Dr. Janis's testimony and Mr. N.'s current VA medical records, his negative assessment of Mr. N.'s condition and prognosis remained unchanged.

■ Because the record links Mr. N.'s continuing mental illness with his past instances of extreme neglect, Judge Reese understandably found that Mr. N.'s improper parental conduct was likely to continue. We emphasize, however, that mental illness alone is not conduct and may not form the basis of a termination order. *See Nada A. v. State*, 660 P.2d 436, 440 (Alaska 1983) (trial court erred in terminating a mother's parental rights simply because she suffered from an impulsive personality disorder).

B. *Did the superior court err in finding that custody by Mr. N. is likely to result in serious emotional or physical harm to the children?*

The trial court concluded that

[Mr. N.] has harmed the children emotionally and physically in the past. And I believe that the evidence shows beyond a reasonable doubt that the children would continue to suffer substantial and serious harm in the future, physical and emotional, if they were placed with him.

■ Mr. N. attacks this finding in several ways. First, he argues that the evidence of past physical harm is based solely on the children's unsubstantiated hearsay statements. Second, Mr. N. argues that DFYS

---

9. Mr. N. also argues that the superior court erred in finding that he had an "extensive criminal history." However the record does not show that the court made any such finding or

that the court relied on any statements concerning Mr. N.'s "criminal history" in the CINA and termination petitions.

has failed to show that the children have been emotionally harmed by his conduct. He emphasizes that K.N., Jr. has positive feelings about him and wants to see him. He attributes J.N.'s negative feelings to the fact that J.N. has not seen him since the day N.N. died. He suggests that her fears stem from this single incident. Finally Mr. N. attacks the children's therapist's assessment on the grounds that her information on Mr. N. was filtered through DFYS.

Mr. N.'s arguments are unpersuasive. Both Dr. McCarthy and the children's therapist clearly considered that Mr. N.'s paranoia and related conduct would emotionally harm the children. There were also numerous reports of excessive and inappropriate discipline. Taking the record as a whole, there is sufficient evidence to support Judge Reese's finding.

C. *Did the superior court err in finding that active remedial efforts had proven unsuccessful?*

(1) Burden of proof [10]

■ On appeal, Mr. N. argues that ICWA requires proof beyond a reasonable doubt that active remedial efforts have been unsuccessful. Further he argues that the preponderance burden set forth in CINA Rule 18(c)(2) is preempted because it is inconsistent with the fundamental purpose of ICWA—to prevent the breakup of Indian families.

Section 1912(d) of ICWA provides:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (1983). On its face, this section does not conflict with the preponderance burden required under CINA Rule

18(c)(2). However, a number of courts have ruled, albeit without much analysis, that the beyond a reasonable doubt burden also applies to proof of active remedial efforts. *See In re S.R.,* 323 N.W.2d 885, 887 (S.D.1982) (where the South Dakota Supreme Court "assume[d] that the same burden required to prove serious emotional or physical harm under § 1912(f), beyond a reasonable doubt, would also be required to prove active efforts by the party seeking termination."); *see also In re Kreft,* 148 Mich.App. 682, 384 N.W.2d 843, 848 (1986) (adopting the *S.R.* holding without analysis); *In re P.B.,* 371 N.W.2d 366, 372 (S.D. 1985).

■ We are unpersuaded by these authorities and conclude that this interpretation is inconsistent with both the plain language of the statute and the relevant legislative history.

[Section 1912(d)] provides that a party seeking foster care placement or termination of parental rights involving an Indian child must satisfy the court that active efforts have been made to provide assistance designed to prevent the breakup of Indian families. The committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures prior to initiating placement or termination proceedings, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families.

H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 22 (1978), U.S.Code Cong. & Admin.News 1978, pp. 7530, 7545; *see also In re Charles,* 70 Or.App. 10, 688 P.2d 1354, 1354 (1984) (finding that the purpose of § 1912(d) is to require an *affirmative* showing by the state that active efforts to reunite the family had failed). Thus we reject Mr. N.'s argument and hold that the standard of proof required is a preponderance of the evidence.

*Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979); *see, e.g., In re J.R.B.,* 715 P.2d 1170, 1172 (Alaska 1986).

---

10. Determining the appropriate burden of proof is a question of law which this court reviews under the substitution of judgment standard.

(2) Sufficiency of the Evidence

■ The trial ·court found that DFYS had met its burden of proving that reasonable efforts had been made to reunite the family. Mr. N. maintains that DFYS decided to terminate Mr. N.'s parental rights immediately after N.N.'s death and that all DFYS's subsequent efforts were geared toward termination rather than reunification.

However the record indicates that Mr. N. refused to follow Dr. McCarthy's recommendations as outlined in the September 1990 treatment plan or cooperate in setting up an alternative plan. He repeatedly denied having mental problems and resisted DFYS's intervention. Although it is true that DFYS might have done more, it is unlikely that further efforts by DFYS would have been effective in light of Mr. N.'s attitude. *See In re Brown*, 112 Idaho 901, 736 P.2d 1355, 1358 (1987) (holding that state made reasonable efforts to reunite family where mother refused to cooperate with state's efforts and where there was no evidence that other efforts would have been productive).

Although this is the most difficult issue presented by this case, taking the record as a whole, there is sufficient evidence that the state tried to keep Mr. N.'s family together.

### III. *Conclusion*

In this tragic case, the legal standards for terminating parental rights imposed by the ICWA and the Alaska Statutes as complied in CINA Rule 18(c) have been fully satisfied. Moreover, the state met its burden of proving that it had made reasonable efforts to prevent the break-up of the N. family. The judgment is therefore AFFIRMED.