63 Cal.App.4th 700 (1998)
In re MICHAEL G. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
GINA L. et al., Defendants and Appellants.
Docket No. D028630.
Court of Appeals of California, Fourth District, Division One.
March 30, 1998.
*703 COUNSEL
Suzanne F. Evans and Kathleen Murphy Malinger for Defendants and Appellants.
John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.
Robert W. Gehring for Minors.
OPINION
BENKE, J.
Appellants Gina L. and Clyde G. appeal from a juvenile court judgment terminating their parental rights and choosing adoption as the *704 appropriate permanent plan for their children, Michael G. and Larissa G. (Welf. & Inst. Code, § 366.26.) Under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.),[1] parental rights shall not be terminated unless the court is satisfied "that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (§ 1912(d).) We hold, apparently as a matter of first impression, that in California "clear and convincing" proof is the applicable standard, as opposed to proof beyond a reasonable doubt as Gina and Clyde urge. They persuasively argue, however, that the court's finding San Diego County Department of Social Services (Department) provided active remedial services for the 12-month statutory period is unsupported by sufficient evidence, and thus we reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
Gina has a long history with child protective services. In addition to Larissa and Michael, she has five other children. The youngest three were declared dependents due to emotional and physical abuse. Gina failed to reunify with them and they were in confidential placement. Gina's primary parenting problem is apparently the inability to control her anger. She served prison time for child abuse and was on probation when this case began.
Twins Larissa and Michael were born prematurely on August 23, 1994, to Gina and Clyde, a registered Navajo Indian. The children, both of whom had medical problems, were detained and placed in foster care upon their release from the hospital. Dependency petitions were filed on September 6, alleging abuse and neglect of the twins' half brother, Gina's son Rick L. Amended petitions filed on September 30 added allegations that Gina and Clyde engaged in violent confrontations, Clyde drank to excess, and Gina abused her daughter Megan L. and her husband's grandson Richard J.[2]
Department's September 1994 report noted Clyde had a history of arrests for public drunkenness and disorderly conduct, and he and Gina had a history of domestic violence. Further, the social worker believed Gina's "past violence and continued volatility and immaturity ... continue to place all her children at risk for abuse and neglect." On September 24, 1994, Department devised reunification plans for the parents requiring Gina to attend therapy and both parents to attend parent education and domestic violence programs. Clyde was also required to undergo a rehabilitation program and submit to chemical testing. The parents were allowed supervised visitation.
*705 In October 1994 Gina and Clyde submitted on the count alleged in the original petition, and the court dismissed the remaining counts with an agreement it could consider them in rendering a dispositional order. The court declared Michael and Larissa dependents in December 1994 and placed them in confidential foster care. In January 1995 Department devised new reunification plans, deleting the domestic violence and drug treatment and testing components[3] and requiring Gina and Clyde to participate in individual and couples therapy and parenting classes. If they showed no improvement in plan compliance in three months, they were to begin chemical testing. The parents were provided with a list of community resource referrals.
According to June and July 1995 reports prepared for the six-month review hearing, Gina had been "very sporadic regarding compliance with her reunification plan." She threatened the social worker and her therapist. Gina attended therapy irregularly, and her therapist reported she had "deteriorated substantially" in the past months and behaved eratically. The therapist agreed with the family's "treatment team" that it "`is in the best interest of all of Gina's children that they be placed in permanent foster care.'"
Gina infrequently visited the twins. When she did visit, her interaction with the children varied from failing to remove them from their strollers or car seats to holding them and changing their diapers. Gina's relationship with Clyde was volatile and included fights for which the police were summoned. In December 1994 Gina spent a week in jail for hitting Clyde with a hammer. Gina and Clyde screamed at each other at a May 1995 visit with the children. Gina had not benefited from an anger management class, and the psychologist who conducted it, Dr. Phillip F. Wroblewski, characterized her as "a very disturbed (and disturbing) woman who presented issues that are more appropriate for individual therapy with a therapist who specializes in treating the borderline personality disorder." Gina began a parenting class in April 1995, but her progress was unknown.
Clyde's progress in his reunification plan was "extremely inconsistent." According to the social worker, "in many respects, the father's behavior is alarming." Clyde appeared for counseling with alcohol on his breath and once tried to remove Michael from his stroller without unbuckling the strap. He had not attended therapy, visited the children only sporadically and was terminated from an anger management class for excessive absences. When he did attend, his behavior was grossly inappropriate. For instance, Clyde flirted with women and once took off his shirt, baring his chest. Wroblewski *706 characterized Clyde as "a low intensity sociopath who just drifts through life." Clyde was arrested in May 1995 for possession of a controlled substance, being under the influence, receiving stolen property, petty theft and resisting arrest. The social worker recommended that visitation be suspended for both parents pending better compliance with their service plans.
At the time of the July 19, 1995, six-month review hearing, Clyde was incarcerated in San Diego on robbery and other charges. He produced evidence he had attended two 12-step meetings and two parenting classes in custody. The court ordered that Gina's visitation would begin when she demonstrated progress with her reunification plan, particularly the therapy component. Clyde's visitation would begin when he was released from jail and demonstrated progress in his reunification plan. It set a 12-month review hearing for January 1996 and ordered the parents to comply with modified reunification plans requiring treatment for substance abuse and chemical testing.
On September 6, 1995, the court heard the Navajo Nation's request for a transfer of jurisdiction and Department's request for a change of placement to the home of the paternal aunt and uncle on the Navajo reservation in Arizona. Gina opposed the motions. The court concluded Gina lacked veto power over the transfer decision, transferred jurisdiction and ordered the children placed with the aunt and uncle.[4]
Gina appealed, and on March 7, 1996, we reversed the court's order insofar as it transferred jurisdiction and suspended Gina's visitation. As to the latter issue, we concluded that while the record established Gina's "serious personal deficiencies," it contained insufficient evidence of "the impact of these characteristics on the minors."[5] We remanded for a hearing on the issue and ordered that the children remain in Arizona pending its outcome. (In re Larissa G. (1996) 43 Cal. App.4th 505, 515 [51 Cal. Rptr.2d 16].)
At a special hearing on June 6, 1996, the court was advised that Gina and Clyde were incarcerated in San Bernardino County. It vacated the previous transfer order, resumed dependency jurisdiction, reappointed counsel for the parents and set a 12-month review hearing, which at that point was beyond the 18-month date. The court noted "the issue of visitation is also to be *707 addressed at the next hearing." At a special hearing on June 14, 1996, the court deferred Gina's request to return the twins to California to the next hearing.
Department's July 1996 report for the 12-month review hearing noted Gina and Clyde were arrested in Barstow on March 20, 1996, and were incarcerated at the West Valley Detention Center in Rancho Cucamonga. Gina was charged with armed robbery, among other things; it is unclear whether Clyde was charged with the same offenses or arrested on a parole violation or outstanding warrants. They continued to maintain a relationship and were expecting another child in October 1996. Gina claimed to have completed a parenting class in the detention center, but it was unverified. Gina's therapist reported she "had been consistent with therapy up until her arrest in [March 1996], was paying out of her own pocket, was making good strides, and had the potential to do good work, although she does not always have the best [judgment]."
Department had no record of Clyde completing a parenting course or attending therapy consistently, and on two occasions he arrived with alcohol on his breath. Clyde did not appear for chemical testing, and there were a number of outstanding warrants for his arrest.
Gina and Clyde appeared in custody at a 12-month review hearing on September 11, 1996. The court found by clear and convincing evidence that reasonable reunification services had been provided and return of the twins to the parents would be detrimental to them. Accordingly, it terminated services and set a hearing under Welfare and Institutions Code section 366.26. Gina did not raise the visitation issue at the hearing, and neither she nor Clyde raised the issue of inadequate reunification services by petitioning for extraordinary writ relief under Welfare and Institutions Code section 366.26, subdivision (l), and California Rules of Court, rule 39.1B.
According to Department's December 1996 assessment report, Clyde returned to the Navajo Nation in October 1996. Two visits with Michael and Larissa did not go well. "[T]he children refused to go to [Clyde] at all and ... Michael `seemed catatonic' and did not make eye contact with him, while [Larissa] cried continuously. Apparently, during the second visit, Michael eventually allowed himself to be held on [Clyde's] knee, though he was not interactive with [Clyde]. [Larissa] remained distraught in the presence of [Clyde] and ran to her foster mother for comfort.... Furthermore, the children displayed anxious behavior after the visits."
A three-day contested selection and implementation hearing began on February 21, 1997. Gina appeared in custody and Clyde appeared by telephone from Arizona. He testified that after his release from jail in late *708 September 1996, he entered a seven-month alcohol recovery program. He quit after just 20 days, though, because he wanted to visit the twins in Arizona. Clyde initially said he had no current problem with drugs or alcohol, but then admitted he used alcohol after returning to the Nation. He had visited the children only a few times because the foster mother canceled appointments. Clyde had verification he completed a parenting program during incarceration, but he did not provide Department with it.
Jennifer Koch, Department's social worker, testified that return of the twins to the parents would cause them serious physical or emotional harm. Lucinda Morris, a social worker with the ICWA program of the Navajo Nation Division of Social Services, testified that Clyde had visited the children on the reservation six times. Larissa rejected him, but Michael allowed himself to be held. After the visits, the children cried and refused to go to sleep in their own beds. Morris believed return of the children to the parents would be "extremely traumatizing." She understood Clyde had outstanding criminal matters in California and thought he was "unable to make a responsible decision regarding the welfare of the children." The twins were very close to their foster parents, who had been approved for adoption.
By the close of the hearing on May 20, 1997, Clyde was reportedly incarcerated for a parole violation. The court found by clear and convincing evidence that "[a]ctive efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and these efforts have proved unsuccessful," and that Michael and Larissa were adoptable and would not benefit from further contact with their parents. It also found beyond a reasonable doubt that the parents' custody of the children would likely result in serious physical or emotional harm. The court terminated Gina's and Clyde's parental rights and found adoption was in the twins' best interests.
On appeal, Gina and Clyde contend the finding required under section 1912(d), must be supported by proof beyond a reasonable doubt, and thus the court erred in applying a clear and convincing proof standard. They also claim insufficient evidence supports the court's findings that active efforts were made to prevent the breakup of the Indian family for the statutory 12-month period.

DISCUSSION

I

The ICWA
In adopting the ICWA in 1978, Congress declared: "[I]t is the policy of this Nation to protect the best interests of Indian children and to promote the *709 stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs." (§ 1902.) The declaration followed findings that children were most vital to the continued existence and integrity of Indian tribes, and an alarming percentage of Indian children were being removed from their parents and placed in non-Indian foster or adoptive homes. (§ 1901(3), (4).)
The United States Supreme Court explained in Mississippi Choctaw Indian Band v. Holyfield (1989) 490 U.S. 30, 36-37 [109 S.Ct. 1597, 1601-1602, 104 L.Ed.2d 29]: "At the heart of the ICWA are its provisions concerning jurisdiction over Indian child custody proceedings. Section 1911 lays out a dual jurisdictional scheme.... [¶] Various other provisions of ICWA Title I set procedural and substantive standards for those child custody proceedings that do take place in state court.... The most important substantive requirement imposed on state courts is that of § 1915(a), which, absent `good cause' to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family, (2) other members of the same tribe, or (3) other Indian families. [¶] The ICWA thus, in the words of the House Report accompanying it, `seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' [Citation.] It does so by establishing `a Federal policy that, where possible, an Indian child should remain in the Indian community,' [citation] and by making sure that Indian child welfare determinations are not based on `a white, middle-class standard which, in many cases, forecloses placement with [an] Indian family.' [Citation.]" (Fns. omitted.)

II

Standard of Proof
(1a) As noted earlier, subdivision (d) of section 1912 prohibits termination of parental rights absent the court's satisfaction that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." Relying upon cases from other jurisdictions, Gina and Clyde contend the stringent beyond a reasonable doubt standard of proof applies.[6]
(2) The interpretation of a statute presents a question of law subject to independent review on appeal. (Board of Retirement v. Lewis (1990) 217 *710 Cal. App.3d 956, 964 [266 Cal. Rptr. 225].) (3a) "Our primary aim in construing any law is to determine the legislative intent. [Citation.] In doing so we look first to the words of the statute, giving them their usual and ordinary meaning. [Citations.]" (Committee of Seven Thousand v. Superior Court (1988) 45 Cal.3d 491, 501 [247 Cal. Rptr. 362, 754 P.2d 708].) (1b) Subdivision (d) of section 1912 is silent regarding any measure of proof. Subdivision (f) of section 1912, on the other hand, expressly mandates that termination of parental rights may not be ordered "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
The insertion of a specific standard of proof in subdivision (f), but not in subdivision (d), of section 1912 evidences the intent that no specific federal standard applies to a determination made under the latter provision. (3b) "`Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.'" (City of Port Hueneme v. City of Oxnard (1959) 52 Cal.2d 385, 395 [341 P.2d 318].) "`It is a well recognized principle of statutory construction that when the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded. [Citations.]' [Citation.]" (Suman v. BMW of North America, Inc. (1994) 23 Cal. App.4th 1, 10-11 [28 Cal. Rptr.2d 133].) (1c) If Congress meant for the "active efforts" determination to be supported by evidence beyond a reasonable doubt, it could easily have said so.[7]
The legislative history, of which we take judicial notice from K.N. v. State (Alaska 1993) 856 P.2d 468, 476, further belies the argument Congress *711 intended proof of active efforts beyond a reasonable doubt. "`[Section 1912(d)] provides that a party seeking foster care placement or termination of parental rights involving an Indian child must satisfy the court that active efforts have been made to provide assistance designed to prevent the breakup of Indian families. The committee is advised that most State laws require public or private agencies involved in child placements to resort to remedial measures prior to initiating placement or termination of proceedings, but that these services are rarely provided. This subsection imposes a Federal requirement in that regard with respect to Indian children and families.' [Citations.]" (Ibid.)
(3c) "Statutes must be given a fair and reasonable interpretation, with due regard to the language used and the purpose sought to be accomplished." (Home Depot, U.S.A., Inc. v. Contractors' State License Bd. (1996) 41 Cal. App.4th 1592, 1601 [49 Cal. Rptr.2d 302].) (1d) In promulgating subdivision (d) of section 1912, Congress sought solely to rectify the nonprovision of any services to Indian families. There is no indication it sought to impose a beyond a reasonable doubt standard of proof upon state courts. Under the same reasoning, in K.N. v. State, supra, 856 P.2d at page 476, the Supreme Court of Alaska held the state court preponderance of evidence standard applied. In In re Annette P. (Me. 1991) 589 A.2d 924, 928, footnote 8, the Supreme Court of Maine held a clear and convincing evidence standard of proof applies to the statute, because "... the federal guidelines should be interpreted to change state law to the least extent possible."
Likewise, the Idaho Supreme Court has held that proof of reasonable rehabilitative efforts and their failure need not be beyond a reasonable doubt. In Matter of Baby Boy Doe (1995) 127 Idaho 452 [902 P.2d 477, 482], the court noted that the word "satisfy" in section 1912(d) "has a distinct meaning. The definition which seems most consistent with this context is `to persuade by argument or evidence.' [Citation.] ... We cannot say that the ordinary meaning of the word satisfy is to convince `beyond a reasonable doubt.' The beyond a reasonable doubt standard connotes a higher evidentiary burden than the ordinary meaning of `satisfy.'" (902 P.2d at p. 482, italics added.) Further, the court concluded the legislative history we cited above, "reveals that Congress meant in subsection (d) to impose a Federal requirement similar to those in state laws, which require agencies involved in child placements to resort to remedial measures before initiating termination proceedings." (Ibid.)
Several other state courts have concluded proof beyond a reasonable doubt is required under subdivision (d) of section 1912. Most of them, however, do *712 not analyze the issue but merely assume the more stringent standard applies.[8] In Matter of Welfare of M.S.S. (Minn. Ct. App. 1991) 465 N.W.2d 412, the court reasoned: "If termination of parental rights of Indian parents to their children can be ordered only upon a factual basis shown beyond a reasonable doubt [citation], and if termination cannot be effected without a showing of active efforts to prevent the breakup of the Indian family and a failure thereof [citation], then the adequacy of efforts and futility of them, as predicates to termination, must likewise be established beyond a reasonable doubt." (Id. at p. 418.) For reasons discussed, we find Matter of Welfare of M.S.S. unpersuasive. The ordinary language of subdivision (d) of section 1912 and its legislative history convince us Congress had no intention of imposing a reasonable doubt standard of proof regarding the active efforts determination.
The federal law is aimed at ensuring the provision of reasonable reunification services by state child protective agencies before parental rights to an Indian child may be terminated. Similarly, a chief objective of California's dependency law is the preservation of the family whenever possible. (In re Matthew C. (1993) 6 Cal.4th 386, 391 [24 Cal. Rptr.2d 765, 862 P.2d 765].) "Thus, the [state] legislative scheme allows the ultimate termination of parental rights only after multiple findings of parental unfitness [and] ongoing reunification efforts[.] [Citations.]" (In re Daniel G. (1994) 25 Cal. App.4th 1205, 1210-1211 [31 Cal. Rptr.2d 75]; Welf. & Inst. Code, § 366.26, subd. (c)(2).) Under Welfare and Institutions Code section 366.21, subdivision (g)(1), a selection and implementation hearing may not be set, "unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or guardian." This test is consistent with the goal of providing parents the fullest opportunity for exercise of their rights not inconsistent with the ultimate best interests of the child. (See In re Angelia P., supra, 28 Cal.3d at p. 919.) We conclude the clear and convincing standard is also consistent with the ICWA's goals, and thus the court here properly applied it to its section 1912(d) analysis.[9]

*713 III

Insufficiency of Evidence
(4a) Gina and Clyde also challenge the adequacy of Department's remedial efforts.[10] Specifically, they assert virtually no services were provided by either Department or the Navajo Nation from the time the court ordered the case transferred to the nation in September 1995 to termination of reunification services in September 1996. Additionally, Gina contends the court erred in failing to hold a hearing regarding her visitation of the children after our remand on the issue. Department concedes services were imperfect but counters that "the parents' failure to stay out of custody made providing them services that much more difficult and contributed significantly to the overwhelming body of evidence that active efforts and reunification services in this case were not likely to succeed or be productively participated in."
(5) To satisfy the requirements of subdivision (d) of section 1912, "active" remedial and rehabilitative efforts must be directed at remedying the basis for the parental termination proceedings, and thus the types of required services depend upon the facts of each case. (In re Crystal K. (1990) 226 Cal. App.3d 655, 667 [276 Cal. Rptr. 619]; Matter of Baby Boy Doe, supra, 902 P.2d at p. 484.) Some courts have interpreted the federal standard to require that child protective services affirmatively prove all "reasonable" efforts to provide the parents with rehabilitative services have been exhausted. (See In re Annette P., supra, 589 A.2d at p. 928.) One commentator on the ICWA has drawn the following distinction between active and passive efforts: "... passive efforts entail merely drawing up a reunification plan *714 and requiring the `client' to use `his or her own resources to[] bring[] it to fruition.' [Citation.] Active efforts, on the other hand, include `tak[ing] the client through the steps of the plan rather than requiring the plan to be performed on its own.'" (A.M. v. State (Alaska 1997) 945 P.2d 296, 306, citing Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual (1984) 157-158.)
(6) While California law does not expressly require "active efforts" to preserve the family, it has been observed: "It is difficult, if not impossible, to exaggerate the importance of reunification in the dependency system. With but few exceptions, whenever a minor is removed from parental custody, the juvenile court is required to provide services to the parent for the purpose of facilitating reunification of the family. [Citation.] Each reunification plan must be appropriate to the parent's circumstances. [Citation.] The plan should be specific and internally consistent, with the overall goal of resumption of a family relationship. [Citation.]" (In re Luke L. (1996) 44 Cal. App.4th 670, 678 [52 Cal. Rptr.2d 53].) "A `mechanical approach' to a reunification plan is not what the Legislature intended: `[s]uch a plan must be appropriate for each family and be based on the unique facts relating to that family.' [Citations.] The effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success." (In re Dino E. (1992) 6 Cal. App.4th 1768, 1777 [8 Cal. Rptr.2d 416].)
(4b) Thus, while the court must make a separate finding under section 1912(d), the standards in assessing whether "active efforts" were made to prevent the breakup of the Indian family, and whether reasonable services under state law were provided, are essentially undifferentiable. Under the ICWA, however, the court shall also take into account "the prevailing social and cultural conditions and way of life of the Indian child's tribe. [Remedial services] shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers." (U.S. Dept. of the Interior, Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67592, § D.2 (Nov. 26, 1979) [guidelines interpreting the ICWA unpublished because binding legislative effect not intended.]; see also Cal. Rules of Court, rule 1439(j).)
Gina and Clyde were entitled to child welfare services for a period not to exceed 12 months, unless extended for an additional 6 months upon an adequate showing that the objectives of the service plan could be achieved within the extended time period. (Former Welf. & Inst. Code, § 361.5, subd. (a).) Between September 24, 1994, and the July 19, 1995, hearing, a period of nearly 10 months, Gina and Clyde did receive a plethora of services aimed at preservation of the family, and they proved markedly unsuccessful. *715 Despite the pendency of Gina's appeal on the transfer order, however, it appears Department lost all contact with both parents. Gina voluntarily continued in her therapy at her own expense until she was arrested in March 1996.
In late June 1996, after the court resumed jurisdiction, Department located Gina and Clyde in jail. Incarcerated parents are entitled to counseling and other services which may be available (Welf. & Inst. Code, § 361.5, subd. (e)), unless the court determines by clear and convincing evidence their provision would be detrimental to the minor. Nonetheless, the social worker spoke with Gina only once, never spoke with Clyde, and made no effort to determine the availability of any services at the detention center. With minor exceptions, Department's July 1996 report for the 12-month review hearing merely repeats the reunification efforts information found in its June and July 1995 reports for the 6-month review hearing. It is inescapable that after the July 19, 1995, hearing, the reunification services Department provided were essentially nil.
Similarly, during the time jurisdiction was transferred to the nation, it offered neither parent any remedial services. Rather, its sole concern was admittedly placing the twins with a Navajo foster or adoptive family. The nation's social workers had no contact with Clyde or Gina throughout the reunification period because they lived in California. Morris, a nation social worker, testified the only reunification services she was aware of were provided by Department.
In sum, the parents received virtually no services after the July 19, 1995, hearing. Department treated this case as if closed after the transfer of jurisdiction, even though Gina's appeal was pending, and the nation was apparently disinterested in the parents reunifying with their children. Neither Gina nor Clyde complained of inadequate services during the reunification period, but normally parents have the assistance of counsel to seek guidance from the juvenile court in formulating a better plan. (See In re Christina L. (1992) 3 Cal. App.4th 404 [4 Cal. Rptr.2d 680].) Here, it appears Gina and Clyde lost their court-appointed trial counsel in San Diego when jurisdiction was transferred, and there is no indication the nation appointed counsel for them. In contrast to the ordinary case, they had no one to help protect their interests during much of the reunification period.
(7) In reviewing the findings of the trial court made pursuant to the ICWA, we must decide if the record contains supporting evidence which is reasonable, credible and of solid value. "Consequently we `employ[] the substantial evidence test by which we review the record in a light most favorable to the judgment and must uphold the trial court's findings unless it *716 can be said that no rational factfinder could reach the same conclusion. [Citation.]' [Citation.]" (In re Krystle D. (1994) 30 Cal. App.4th 1778, 1795-1796 [37 Cal. Rptr.2d 132].) (4c) In light of the entire record, we conclude the court's "active efforts" finding is not supported by substantial evidence, and in order to protect the parents' due process rights, the matter must be remanded for provision of services to them for the remainder of the 12-month statutory period. (See Carolyn R. v. Superior Court (1995) 41 Cal. App.4th 159, 166 [48 Cal. Rptr.2d 669]; In re Daniel G., supra, 25 Cal. App.4th at pp. 1209-1217; In re Dino E., supra, 6 Cal. App.4th at p. 1777.) Through no fault of the parents, the court's erroneous transfer of jurisdiction resulted in a lengthy hiatus in services, Department monitoring and representation by counsel. Further, we instruct the court on remand to reconsider Gina's visitation issue, which it failed to do after our remand in In re Larissa G., supra, 43 Cal. App.4th 505. While Gina waived appellate review here by failing to object, it is appropriate to rectify the situation since the case is returning to juvenile court for other reasons.
In light of the parents' serious problems and dim prospects of reunification, it is particularly tragic that more than three years after Department's intervention Larissa and Michael remain without the permanence and stability they deserve. Contrary to Department's position, though, the 12-month statutory reunification period is not reduced simply because parents are not expected to comply or succeed. (See In re Dino E., supra, 6 Cal. App.4th at p. 1777.) This predicament underscores the importance of making the findings required by subdivision (d) of section 1912 before scheduling a selection and implementation hearing, so the matter can be reviewed in extraordinary writ proceedings.[11]

DISPOSITION
The judgment is reversed and the matter remanded to the trial court for further proceedings consistent with the views expressed herein.
Kremer, P.J., and Haden, J.,[*] concurred.
NOTES
[1] Statutory references are to 25 United States Code except where otherwise specified.
[2] Gina was married to someone other than Clyde.
[3] Nonetheless, domestic violence or anger management programs were authorized for the parents.
[4] The children were eventually removed from the custody of the aunt and uncle due to physical abuse and placed in foster care on the reservation.
[5] While the opinion was published, these remarks appeared in an unpublished portion of the opinion regarding visitation.
[6] The burden of proof may require a party to "establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt." (Evid. Code, § 115.) "`A preponderance of the evidence standard ... simply requires the trier of fact "to believe that the existence of a fact is more probable than its nonexistence." (In re Angelia P. (1981) 28 Cal.3d 908, 918 [171 Cal. Rptr. 637, 623 P.2d 198].) "`Clear and convincing' evidence requires a finding of high probability[, or] evidence ... `"so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind."' [Citation.]" (Id. at p. 919.) "`The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence  that bedrock "axiomatic and elementary" principle whose "enforcement lies at the foundation of the administration of our criminal law." [Citation.]'" (Id. at p. 918.)
[7] Congress's concern with a federal standard of proof in only limited instances is further evidenced by subdivision (e) of section 1912, which prohibits ordering foster care placement absent "a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."
[8] For example, in People in Interest of S.R. (S.D. 1982) 323 N.W.2d 885, 887, the court stated: "[W]e assume that the same burden ... under § 1912(f), beyond a reasonable doubt, would also be required to prove active efforts." Other courts have relied without analysis upon People in Interest of S.R. or its progeny. (See, e.g., Matter of Morgan (1985) 140 Mich. App. 594 [364 N.W.2d 754, 758]; Matter of Kreft (1986) 148 Mich. App. 682 [384 N.W.2d 843, 848]; In re L.N.W. (Iowa Ct. App. 1990) 457 N.W.2d 17, 18; In re Interest of D.S.P. (1990) 157 Wis.2d 106 [458 N.W.2d 823, 828].)
[9] Department points out that reasonable services must be proven by clear and convincing evidence before a selection and implementation hearing is scheduled at the 6-month or 12-month review stage (Welf. & Inst. Code, § 366.21, subd. (g)(1)), but when it is scheduled at the 18-month review stage, proof by only a preponderance of the evidence is required. (Welf. & Inst. Code, § 366.22, subd. (a).) As a practical matter, the local juvenile court appears to apply a clear and convincing standard of proof in determining whether reasonable services were provided even at the 18-month mark, as was done here. We are not required to decide whether, as Department argues, findings under subdivision (d) of section 1912 may be made by a preponderance of the evidence at the 18-month stage.

Another question not before us is when the finding under subdivision (d) of section 1912 must be made. Here, the court made it during the selection and implementation hearing. It appears, however, that it should be made before scheduling such a hearing, just as the reasonable services findings must be made under Welfare and Institutions Code sections 366.21, subdivision (g)(1), and 366.22, subdivision (a). An order setting a hearing under Welfare and Institutions Code section 366.26 is not appealable unless a petition for extraordinary writ review is filed in a timely manner and either summarily denied or not decided on its merits. (Welf. & Inst. Code, § 366.26, subd. (l); Cal. Rules of Court, rule 39.1B.) "The purpose of the statute is to provide for immediate writ review of meritorious issues subsumed within the order setting a section 366.26 hearing to ensure that the hearing is not infected with reversible error even before it commences." (Joyce G. v. Superior Court (1995) 38 Cal. App.4th 1501, 1512 [45 Cal. Rptr.2d 805], fn. omitted.)
[10] At the juvenile court, the parties and court agreed that "active efforts" were required by subdivision (d) of section 1912 up to September 11, 1996, the date reunification services were terminated and a selection and implementation hearing was scheduled.
[11] Our holding makes it unnecessary to consider the parents' additional insufficiency of evidence argument regarding the court's finding under subdivision (f) of section 1912.
[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.