## IN THE MATTER OF KREFT

Docket No. 83932. Submitted December 9, 1985, at Grand Rapids.— Decided February 3, 1986.

The Department of Social Services filed a petition in Chippewa Probate Court seeking a termination of the parental rights of respondents Mary Eames Lawless and Raymond Frederick Kreft to their child, Lena Clelia Kreft. Respondent Lawless is a member of the Sault Ste. Marie Tribe of Chippewa Indians. The probate court, Lowell R. Ulrich, J., assumed jurisdiction over the child following an adjudicative hearing and terminated respondents' parental rights at a dispositional hearing after reviewing a written report on a psychological evaluation of respondent Lawless. Respondent Lawless appealed. *Held:*

1. Any Indian child who is the subject of any action for foster care placement or termination of parental rights under state law, or his parent or guardian, or the tribe may petition the probate court to invalidate such action upon a showing that such action violated the Indian Child Welfare Act. Respondent therefore had standing to challenge the petition.

2. Petitioner sustained its burden of proving by clear and convincing evidence, which included the testimony of qualified expert witnesses at the adjudicative hearing, that the continued custody of the child by respondent Lawless was likely to result in serious emotional or physical damage to the child.

3. Petitioner sufficiently showed at the dispositional hearing that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of respondents' Indian family and that the efforts proved unsuccessful.

Affirmed.

REFERENCES

Am Jur 2d, Indians §§ 63-68.

Am Jur 2d, Infants §§ 28 *et seq.*

Am Jur 2d, Parent and Child §§ 25 *et seq.,* 90.

Validity of state statute providing for termination of parental rights. 22 ALR4th 774.

Standing of foster parent to seek termination of rights of foster child's natural parents. 21 ALR4th 535.

See also the annotations in the ALR3d/4th Quick Index under Indians.

1. INDIANS — CHILD CUSTODY — TERMINATION OF PARENTAL RIGHTS —
   INDIAN CHILD WELFARE ACT.

   A proceeding to terminate parental rights to an Indian child
   under state law must meet the minimum federal standards
   established in the Indian Child Welfare Act, which includes a
   provision that parental rights not be terminated unless there is
   proof beyond a reasonable doubt that the continued custody of
   the child by the parent or custodian is likely to result in
   serious emotional or physical damage to the child and that
   there is some evidence that active efforts have been made to
   provide remedial services and rehabilitative programs designed
   to prevent the breakup of the Indian family and that these
   efforts have proved unsuccessful (25 USC 1912[f]).

2. INDIANS — CHILD CUSTODY — TERMINATION OF PARENTAL RIGHTS —
   INDIAN CHILD WELFARE ACT.

   Any Indian child who is the subject of any action for foster care
   placement or termination of parental rights under state law, or
   his parent or guardian, or the tribe may petition the probate
   court to invalidate such action upon a showing that such action
   violated the Indian Child Welfare Act (25 USC 1901 *et seq.*).

*Robert Capriccioso,* Prosecuting Attorney, and
*Mark L. Dobias,* Assistant Prosecuting Attorney,
for petitioner appellee Department of Social Ser-
vices.

*Peacock, Ingleson & Vinocur, P.C.,* (by *John W.
Leudesdorff*), Guardian Ad Litem for Lena Clelia
Kreft.

*Andary & Andary* (by *Carol S. Andary*), for
respondent Lawless.

Before: ALLEN, P.J., and R. B. BURNS and N. J.
KAUFMAN,* JJ.

ALLEN, P.J. Respondent Mary Eames Lawless
(hereafter respondent), a member of the Sault Ste.
Marie Tribe of Chippewa Indians, appeals as of

---

* Retired Court of Appeals judge, sitting on the Court of Appeals by
assignment.

right from a February 26, 1985, probate court order terminating parental rights with regard to her daughter, Lena Clelia Kreft. Although the order also terminated the parental rights of Raymond Frederick Kreft, the natural father, he has not joined in appealing the order. Moreover, the Sault Ste. Marie Tribe of Chippewa Indians, which intervened in the probate court action, has not taken an appeal.

Lena Kreft was born on September 2, 1984. Prior to her birth, respondent had indicated that she did not wish to parent the child and that she was leaning toward a decision to release the infant for adoption. However, she ultimately decided to keep her daughter but, when she and her daughter were released from the hospital following the birth, respondent lacked such basic provisions as a crib or bassinet, clothing and diapers. In addition, mother and child resided in a small poorly ventilated motel room which had cooking and food storage facilities.

Respondent suffers from a longstanding mental illness which previously resulted in termination of parental rights with respect to three other children. In a neglect petition filed on September 20, 1984, it was alleged that this mental illness continued, that respondent could not provide necessary care for the child, and that the home or environment was an unfit place for the child to live. A preliminary hearing was held on September 26, 1984, but respondent did not appear. Attorneys were appointed and it was determined that the child would remain at home.

On October 2, 1984, an order was entered which authorized that Lena Kreft be placed in temporary custody at a Department of Social Services foster home. It was alleged that the child was endangered, which allegation was based on a statement

by respondent to the effect that she would throw the baby in the "power canal" and that "would be the end of it". Although served with notice of a hearing on October 3, 1984, respondent again did not appear. It was ordered that the child remain in foster care pending a formal adjudication hearing.

A supplemental petition was filed on October 4, 1984, which alleged: (1) that respondent had threatened to throw the baby in the canal, (2) that respondent had indicated that she did not want the child because it had reminded her of and was a part of its father, with whom respondent was angry, and (3) that she wished to give the child to the church and wanted the baby to go to heaven. The petition requested that Lena Kreft be made a permanent ward, whereas the initial petition had merely requested that the probate court take jurisdiction of the child.

A hearing on the petition and supplemental petition was originally scheduled for November 20, 1984, but was adjourned to December 18, 1984, upon stipulation of the parties. On December 18, 1984, neither parent appeared and a question arose regarding whether respondent had ever been served with notice. It appeared that she had been evading service. In any event, the hearing was adjourned to January 3, 1985.

The hearing proceeded on January 3, 1985. At its conclusion, the probate court assumed jurisdiction over the child but declined to terminate parental rights. The court ordered that respondent undergo a psychological evaluation and indicated that a dispositional hearing would be set once that was accomplished. A report on the evaluation was written on February 20, 1985, and the dispositional hearing was held on February 28, 1985. It

was at the conclusion of this hearing that the court terminated respondent's parental rights.

None of the parties dispute that Lena Clelia Kreft is an "Indian child" within the meaning of 25 USC 1903(4).[1] Therefore, an involuntary proceeding for termination of parental rights over the child must conform with the minimal federal standards found in 25 USC 1912, which provides in pertinent part:

"(d) Remedial services and rehabilitative programs; preventive measures.

"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that *active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.*

"(e) Foster care placement orders; evidence; determination of damage to child

"No *foster care placement* may be ordered in such proceeding in the absence of a determination, supported by *clear and convincing evidence, including testimony of qualified expert witnesses,* that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

"(f) Parental rights termination orders; evidence; determination of damage to child

"No *termination of parental right* may be ordered in such proceeding in the absence of a determination, supported by *evidence beyond a reasonable doubt,* including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (Emphasis added.)

[1] 25 USC 1903(4) provides: " 'Indian child' means any unmarried person who is under age eighteen and either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

See generally, *In the Matter of Morgan,* 140 Mich App 594, 601-603; 364 NW2d 754 (1985).

Subsection (d) suggests that these federal requirements must be established in addition to whatever state law grounds are asserted as a basis for terminating parental rights. In the case before us, the state statutory ground relied upon by the probate court judge in terminating rights was MCL 712A.19a(c); MSA 27.3178(598.19a)(c):

> "A parent or guardian of the child is unable to provide proper care and custody for a period in excess of 2 years because of a mental deficiency or mental illness, without a reasonable expectation that the parent will be able to assume care and custody of the child within a reasonable length of time considering the age of the child."

Respondent makes no argument that the prerequisites of § 712A.19a(c) or 25 USC 1912(f) were not satisfied. Rather, she has limited the issues raised on appeal to (1) whether there was a sufficient showing at the dispositional hearing of affirmative efforts to provide remedial services and rehabilitative programs and that these efforts failed, and (2) whether jurisdiction over the child was assumed in violation of 25 USC 1912(e), due to a lack of qualified expert witnesses. We will address these issues in reverse order.

Preliminarily, we note that petitioner asserts that respondent lacks standing to challenge alleged violations of the Indian Child Welfare Act since her tribe has not joined in the appeal. This argument is based on the use of the conjunction "and" in 25 USC 1914, which provides:

> "Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from

whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title."

We believe that this statute defines the class of entities which *may* petition a court for invalidation of an order, but not that it requires the child, parent or guardian *and* tribe to join in the petition. Although use of the conjunction "and" instead of the disjunctive "or" creates an ambiguity in the statute, ambiguous language in statutes must be construed to give effect to the Legislature's intent. *Karl v Bryant Air Conditioning Co,* 416 Mich 558, 567; 331 NW2d 456 (1982). The words of the statute must be construed in light of the general purpose sought to be accomplished by the Legislature. *In re Heffernan Estate,* 143 Mich App 85, 88; 371 NW2d 481 (1985).

In 25 USC 1902, Congress enunciated the central purpose of the Indian Child Welfare Act:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

If § 1914 were construed to require that all three entities mentioned in the statute coalesce in challenging the validity of an order, the congressional purpose of ensuring compliance with minimal federal standards would be rendered more difficult to

achieve. Rather than furthering the legislative purpose, the central purpose would be frustrated. Therefore, we believe that Congress meant that either the child, parent or guardian, *or* the tribe could petition to invalidate the action. Accordingly, we will address the merits of respondent's appeals.

Respondent first maintains that petitioner failed to sustain the clear and convincing evidentiary burden imposed by 25 USC 1912(e) for the adjudicative hearing. This provision requires that the evidence include "testimony of qualified expert witnesses", and that the evidence show that continued parental custody would "result in serious emotional or physical damage to the child". We review the probate court's determination under a clearly erroneous standard. *In re Cornet,* 422 Mich 274; 373 NW2d 536 (1985).

There is no definition of "qualified expert witness" in the Indian Child Welfare Act. However, the House Report prepared in conjunction with the act states that the phrase "is meant to apply to expertise beyond the normal social worker qualifications". H R Rep No 95-1386, 95th Cong, 2d Sess, reprinted in U.S. Code Cong & Ad News 7530, 7545 (1978). In addition, guidelines prepared by the U.S. Department of Interior, Bureau of Indian Affairs, provide:

"Persons with the following characteristics are likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

"(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organizations and child rearing practices.

"(ii) A lay expert witness having substantial experience with the delivery of child and family services to Indians, and extensive knowledge of prevailing social

and cultural standards and child rearing practices within the Indian child's tribe.

"(iii) A professional person having substantial education and experience in the area of his or her specialty." 44 Fed Reg 67593, § D.4(b).

The act has been interpreted to mean that only one "qualified expert witness" need testify. *DAW v State of Alaska,* 699 P2d 340, 342 (Alaska, 1985).

Six witnesses testified at the January 3, 1985, hearing where the court assumed jurisdiction over Lena Kreft. At least two of these witnesses were "qualified expert witnesses" within the meaning of the statute.

Frances Kokko, a mental health social worker supervisor for the Sault Ste. Marie Tribe, and a member of the tribe, testified that she was knowledgeable as to Indian customs relative to child rearing. She was qualified as an expert. Kokko testified that she had known respondent since high school and, having observed her over the course of years, Kokko stated that respondent did not remain stable for significant periods. She did not believe that respondent was amenable to behavioral changes, as respondent was not easily persuaded. Kokko feared for the child's emotional and physical well-being because of respondent's instability and the concern that any progress respondent might make would probably not enable her to attend to her child.

Dr. William Patrick Brady, a psychologist, was qualified as an expert. Although he could not give any current opinion as to respondent's psychological state, he had been respondent's therapist from 1974 through 1977. His records indicated that she had been diagnosed a schizophrenic, paranoid type, when committed to the Newberry Regional Mental Health Center in June, 1975. He had personally

diagnosed respondent as schizophrenic, chronic, undifferentiated, in November, 1976. At that time, respondent was treated with psychotropic medication and psychotherapy and seemed to be making some reasonable progress.

The following witnesses were not recognized as qualified expert witnesses. Kathy Clancy, a social worker, testified that she became concerned that the child might be harmed on October 3, 1984, when respondent expressed anger towards the child's father and then indicated that she did not want to have anything to do with the baby. Elsie Van Dusen, a public health nurse who had worked with respondent since the baby's birth, testified that she found certain behavior and statements by respondent inappropriate. For example, respondent believed the infant's feelings were hurt when left with her grandmother and refused to pursue an offer of a bassinet, because "she wanted to have the baby very close to her at all times". Van Dusen came to question respondent's mental stability, especially on October 2, 1984, when respondent indicated she wanted her baby to go to heaven and had contemplated placing the baby in the power canal. In addition, Van Dusen had to intervene to prevent respondent from bathing the infant in steaming water. Van Dusen had suggested counseling to respondent on a number of occasions, but respondent indicated that she did not want to become dependent on pills.

Perhaps the most significant testimony came from Thomas V. O'Melia, a clinical psychologist with Catholic Social Services. He had three to five contacts with respondent from September 5, 1984, through October 3, 1984, when the baby was removed from the home. O'Melia testified that during his visits with respondent, she used "neologism", *i.e.*, she invented words with no dictionary

meaning. Moreover, she exhibited irrational behavior consistent with a diagnosis of schizophrenia, and was often confused in thought and orientation. O'Melia was concerned about respondent's ability to parent. During his second home visit on September 18, 1984, he noted that the child appeared apathetic and that respondent handled the baby roughly. Moreover, he believed that respondent had a paranoid ideation with respect to her interpretation of the Bible, as she believed that both she and the child were specifically referred to in the Bible. O'Melia became concerned about the child's well-being on September 25, 1985, when respondent talked about giving the child to the church, about the child's father being an "evil symbol", and about "possessions", and about placing the child in the power canal. O'Melia believed that respondent's prognosis for treatment was "extremely poor", and stated that her type of schizophrenia did not "remediate easily".

We believe that both Kokko and Dr. Brady, if not Mr. O'Melia, were "qualified expert witnesses" within the meaning of 25 USC 1912(e), as that term has been explained by the Department of Interior guidelines. Kokko had substantial experience relative to child and family services to Indians, as she testified that, in providing services as a social worker to the tribe, she utilized a variety of available resources. Moreover, she testified that she was born on a reservation, was a full-blooded Indian, and knew of Indian customs regarding child-rearing practices. Brady, and possibly O'Melia, were professionals with substantial education and experience in their specialty of psychology. We do not believe that the probate court clearly erred in finding that serious emotional or physical damage might come to the child if it remained in respondent's custody, based on the testimony of

these qualified experts and the testimony of other witnesses.

Respondent next argues that at the dispositional hearing there was an insufficient showing of active efforts to provide respondent with remedial services and rehabilitation programs, and an insufficient showing that these efforts were unsuccessful, as required by 25 USC 1912(d). These efforts and their futility must be shown beyond a reasonable doubt. *In re Morgan, supra,* p 604, citing *People in the Interest of SR,* 323 NW2d 885 (SD, 1982). However, the record belies respondent's allegations that these requirements were not satisfied.

Leroy Pieri, a caseworker with the Chippewa County Department of Social Services, testified that in June of 1984, respondent was staying at the Sheperding Home, the arrangements for which had been made through the Crisis Pregnancy Center. Pieri assisted respondent in filling out the application for public assistance, as she found it confusing. Respondent eventually moved in with her parents but, when she left abruptly and went to the Domestic Violence Shelter, Peiri assisted her in finding alternative emergency housing at a motel and helped her obtain some basic household items and items for the baby. He offered to help her find more suitable housing, but she refused to have any dealings with Pieri after August, 1984. In addition, the Department of Social Services arranged for personal visits to respondent by someone associated with the homemaker program. Also, she had received parent aid services from 1979 through 1982.

Respondent also received visits from Elsie Van Dusen, who provided her with nutritional guidance regarding the infant and attempted to impart an understanding relative to the growth and development of the child. Frances Kokko testified that she

attempted to contact respondent on six occasions. Although respondent was home, she would not answer the door. In addition, Thomas O'Melia testified that he contacted respondent while she was in the hospital following the birth, on September 5, 1984, and offered her any services that Catholic Social Services provided. Respondent indicated that she wished to talk to him about the baby and religious problems, and O'Melia proceeded to meet with her on three occasions during the ensuing month. He had made several other attempts to contact her.

Van Dusen testified that she had suggested to respondent that she get mental health counseling. Although respondent was apparently receptive to this idea at times, she also indicated that she did not want to have anything to do with such matters, which was apparently related to her concern that she would become dependant on medication.

Although respondent reacted favorably to some of these services, *e.g.*, the infant adequately gained weight due to the nutritional counseling of Van Dusen, it was apparent that the remedial services were, for the most part, unsuccessful. Despite almost three years of parent classes, respondent almost bathed the baby in steaming water. Moreover, it appeared that despite these efforts, respondent's mental problems posed a threat to her child and interfered with her ability to care for the child.

Dr. Richard Shaul, a clinical psychologist, testified at the dispositional hearing. He had evaluated respondent after the adjudicative hearing and concluded that she suffered from a schizophrenic disorder, paranoid type, of acute psychotic proportions. Moreover, he opined that respondent was not able to care for the needs of a young child and that although her disorder was treatable, her prog-

nosis was "poor to guarded". In any event, he did not believe that she could be treated within a reasonable length of time to enable her to take care of the child.

We believe that this evidence was sufficient to satisfy the criteria of 25 USC 1912(d). It demonstrated that numerous efforts were made to provide respondent with the skills necessary to care for the child and that these efforts did not meet with sufficient success. Although respondent never received treatment for her mental illness during the pendency of these proceedings, she was made aware that these services were available but vacillated on whether she would cooperate in such treatment. In any event, she stated that she would spurn attempts to treat her with medication, which appeared essential to any successful treatment program. Even if she cooperated in treatment, Dr. Shaul testified that the treatment could not be accomplished within a reasonable time. Given this evidence, we do not believe that the decision of the probate court, finding that these elements were proven beyond a reasonable doubt, was clearly erroneous.

Affirmed.