2001 ND 68

## In the Interest of M.S., a child.

**Barb Dvorak, Petitioner and Appellee,**

v.

**S.H., Mother, Respondent and Appellant,**

and

**C.S., Father, Respondent,**

and

**M.S., Child, and her Guardian Ad Litem, William D. Schmidt, Attorney at Law, Respondents and Appellees.**

No. 20000183.

Supreme Court of North Dakota.

April 12, 2001.

Rick Lee Volk, Assistant State's Attorney, Bismarck, ND, for petitioner and appellee Barb Dvorak.

Edwin W.F. Dyer, III, Dyer & Summers, P.C., Bismarck, ND, for respondent and appellant S.H., Mother.

William Delaney Schmidt, (on brief), Guardian Ad Litem, Bismarck, ND, for respondent and appellee M.S., Child.

MARING, Justice.

[¶ 1] S.H. ("Sharon," a pseudonym) appealed from an order of the juvenile court terminating her parental rights to her daughter, M.S. ("Mandy," a pseudonym).[1] We conclude there is clear and convincing evidence warranting termination of Sharon's parental rights and there is evidence beyond a reasonable doubt that Sharon's continued custody of Mandy is likely to result in serious emotional or physical damage to the child. We affirm.

I

[¶ 2] Mandy was born on June 24, 1993. In September 1997, the juvenile court declared Mandy a deprived child and placed her in the custody of Burleigh County Social Services. Except for a period of about three weeks Mandy has resided in a foster home since September 1997. On August 2, 1999, Burleigh County filed a petition to terminate Sharon's parental rights. Following a bench trial, the juvenile court granted the petition.

II

[¶ 3] Sharon asserts the evidence is insufficient to prove beyond a reasonable doubt Sharon's continued custody of Mandy is likely to result in serious emotional or physical damage to Mandy.

---

**1.** The parental rights of Mandy's biological father, C.S., were also terminated, but he did not contest the parental termination proceedings and is not a party to this appeal.

[¶ 4] The juvenile court may terminate parental rights, providing: (1) the child is a deprived child; (2) the conditions and causes of the deprivation are likely to continue; and (3) the child is suffering, or will in the future probably suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27–20–44(1)(b); *In re C.R.*, 1999 ND 221, ¶ 4, 602 N.W.2d 520. The party seeking parental termination must prove all elements by clear and convincing evidence. *Id.* In addition to our state law requirements for parental termination, the requirements of the Indian Child Welfare Act, 25 U.S.C. § 1912 must be met, because Mandy is a member of the Yankton Sioux Tribe and is, therefore, an Indian child as defined by the Act. 25 U.S.C. § 1903(4); *see also B.R.T. v. Executive Director of the Social Service Board of North Dakota,* 391 N.W.2d 594, 598 (N.D.1986). Relevant to this issue, 25 U.S.C. § 1912(f) provides:

> No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

These state and federal provisions create a dual burden of proof for the party seeking parental termination of the parent of an Indian child, whereby the elements of our state law must be proven by clear and convincing evidence and the federal requirement, that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child, must be satisfied with proof beyond a reasonable doubt.[2] *See Matter of Bluebird,* 105 N.C.App. 42, 411 S.E.2d 820, 823 (1992).

[¶ 5] On appeal, we review the juvenile court's decision regarding termination of parental rights and examine the evidence in a manner similar to a trial de novo. *In re A.M.,* 1999 ND 195, ¶ 7, 601 N.W.2d 253. While we are not bound by the juvenile court's findings, we give them appreciable weight and give deference to the juvenile court's decision, because that court had an opportunity to observe the candor and demeanor of the witnesses. *Id.*

[¶ 6] The juvenile court specifically recognized the petitioner had to prove beyond a reasonable doubt that Sharon's continued custody of Mandy would likely result in serious emotional or physical damage to Mandy, and the court concluded the petitioner met this burden.

[¶ 7] Barb (Dvorak) Stegmiller is a social worker with Burleigh County Social Services who has been licensed for 16 years and has been involved with Mandy's case for approximately four years. Stegmiller testified Mandy was placed in foster care for several reasons. She testified Mandy had chronic head lice for months and Sharon was not willing to cooperate in alleviating the problem. She testified Sharon was not able to focus on her parental responsibilities and often allowed Mandy, at age 3 or 4, to wander off unsupervised and without Sharon knowing Mandy's whereabouts. Sharon would also forget to feed Mandy or provide other necessary care for Mandy, such as bathing and teeth brushing. Stegmiller testified Sharon would often give away food to others, resulting in inadequate food in the house to properly nourish herself or Mandy. Sharon would also loan her car to others, leaving her without means to transport Mandy to a daycare provider so Sharon could get to her job outside the home.

[¶ 8] Various social workers provided assistance to Sharon in an attempt to enhance her parenting skills. While Mandy

---

2. While Sharon has alleged the requirements of the federal Act have not been met, she has not asserted the petitioner has failed to prove the elements of the state statute for terminating her parental rights.

was in foster care, Sharon was allowed frequent visitations and they were gradually extended to overnight visitations to facilitate Sharon acquiring the necessary parental skills to care for Mandy. Despite continued problems and slow progress, Mandy was returned to Sharon's home on September 17, 1998. She remained there only until October 5, 1998 when she was again removed from the home and placed in foster care, because Sharon's parenting abilities had not materially improved so as to guarantee Mandy's health and safety. When returned to the home for this trial period, Mandy was not adequately fed. Both Mandy and Sharon developed cases of head lice, and Sharon refused to cooperate with the social worker aides to alleviate the conditions. Stegmiller testified parent aide services were discontinued in February 1999, because Sharon was not willing to work with social workers to develop the skills necessary to provide minimally acceptable care for Mandy. During the summer of 1999, Sharon moved with a boyfriend to Grafton. She did not give the social workers her address, and the agency lost contact with Sharon during the weeks she was away.

[¶ 9] Stegmiller testified Mandy was at risk of physical harm from lack of food and inadequate supervision in Sharon's home and may well have suffered physical harm if she had not been removed from the home and placed in foster care. Stegmiller testified Mandy is a deprived child and the deprivation could result in emotional and physical harm to her.

[¶ 10] Dr. Lisa Hay is a clinical psychologist, who evaluated Sharon in October 1997 and who has provided therapy for Sharon since December 1997. Dr. Hay testified Sharon is of low-average intelligence but when Sharon is operating under stress her functioning drops to a borderline level. She testified Sharon suffers from an adjustment disorder with mixed anxiety and depressed mood with low self-esteem. She testified Sharon finds it very hard to put Mandy's basic needs "ahead of the most immediate thing in front of her." Dr. Hay said she was working with Sharon to build Sharon's self-esteem and in "getting better boundaries so that she didn't get taken advantage of by people so much so easily." Dr. Hay testified Sharon's needs for therapy are long term.

[¶ 11] Dr. Richard Athey evaluated both Sharon and Mandy. Athey is a medical doctor who also has a Ph.D. in physiology and pharmacology and is board certified in adult psychiatry and child adolescent psychology. Dr. Athey testified Mandy "seems to have an attachment to her mother" and it would be beneficial for Mandy if the two could maintain some relationship in the future. However, Dr. Athey also testified Sharon is not capable of taking care of Mandy "without significant services" and there could probably not be enough support services in the community "to where [Mandy] could be with [Sharon] and function adequately." Dr. Athey testified Sharon has not demonstrated an ability to appropriately parent Mandy, and he does not believe Sharon could provide a structured, consistent, and nurturing environment for Mandy. Dr. Athey testified that even if assistance services were provided to Sharon, her inability to parent Mandy would continue long term. He testified the prognosis for Sharon being able to provide adequate parenting in the future is not good and the likelihood of Sharon acquiring significant changes in her parenting skills to meet Mandy's needs "would be pretty slim."

[¶ 12] A parent's fundamental and natural right to her child is of constitutional dimension, but it is not absolute, and a parent must at least provide care that satisfies the minimum community standards. *In Interest of L.F.*, 1998 ND 129, ¶ 9, 580 N.W.2d 573. We continue to adhere to our statement that a lack of cleanliness of the home cannot alone establish deprivation. *Asendorf v. M.S.S.*, 342 N.W.2d 203, 207 (N.D.1983). Long term and intensive treatment for a parent is not

mandated if it cannot be successfully undertaken soon enough to enable the child to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care. *In Interest of J.L.D.,* 539 N.W.2d 73, 77 (N.D.1995).

[¶ 13] Mandy has been in foster care for nearly three and one-half years. She was placed there because Sharon was unable to provide for Mandy's basic needs, including food and adequate supervision. Attempts to educate Sharon and to enhance her parenting skills resulted in failure when Mandy was returned to Sharon's home on a trial basis. At that time, Sharon remained unable or unwilling to stay focused on providing Mandy with basic needs and care. Dr. Athey testified the prospects for Sharon acquiring the necessary parenting skills are not good.

[¶ 14] When there has been an extensive period of time in which efforts have been made to overcome a parent's inabilities to effectively parent, the courts cannot allow the child "to remain in this indeterminate status midway between foster care and the obvious need for permanent placement." *In re A.M.,* 1999 ND 195, ¶ 9, 601 N.W.2d 253. Having carefully reviewed this record, we conclude it contains evidence showing by proof beyond a reasonable doubt that Sharon's continued custody of Mandy is likely to result in serious emotional or physical damage to Mandy.

### III

[¶ 15] Sharon asserts there is inadequate record evidence to show by proof beyond a reasonable doubt that active efforts were made to prevent the breakup of this Indian family. The relevant federal provision regarding this issue is 25 U.S.C. § 1912(d):

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide

remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

### A

[¶ 16] Sharon argues this federal provision requires the petitioner to prove beyond a reasonable doubt that unsuccessful efforts were made to prevent the breakup of the Indian family. The petitioner asserts proof by clear and convincing evidence is the appropriate standard. While Subsection 1912(f) specifically requires "evidence beyond a reasonable doubt" that continued custody of a child by an Indian parent will likely result in serious emotional or physical damage to the child, Subsection 1912(d) contains no express language requiring evidence beyond a reasonable doubt. Rather, this subsection merely requires a party seeking termination of parental rights to "satisfy the court" that unsuccessful active efforts have been made to prevent the breakup of the Indian family. On its face, Subsection 1912(d) does not mandate a standard of proof beyond a reasonable doubt.

[¶ 17] The United States Supreme Court in *Santosky v. Kramer,* 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), held that in parental termination proceedings the clear and convincing evidence standard of proof satisfies constitutional due process requirements. We apply the clear and convincing evidence standard of proof for deciding whether the elements of our state statute have been met in parental termination proceedings. *See, e.g., In re C.R.,* 1999 ND 221, ¶ 4, 602 N.W.2d 520.

[¶ 18] Some courts, offering no persuasive rationale, have applied the "beyond a reasonable doubt" standard to Subsection 1912(d). *See, e.g., People in Interest of S.R.,* 323 N.W.2d 885, 887 (S.D.1982). Other jurisdictions have reasoned, persuasively in our opinion, that use of a lesser standard than evidence beyond a reason-

able doubt is appropriate for determining compliance with 25 U.S.C. § 1912(d). *See, e.g., K.N. v. State*, 856 P.2d 468, 476 (Alaska 1993); *In re Annette P.*, 589 A.2d 924, 928 n. 8 (Me.1991). We hold the petitioner must demonstrate, under 25 U.S.C. § 1912(d), by clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and those efforts were unsuccessful.

### B

[¶ 19] Stegmiller testified parent aide services were provided to improve Sharon's parenting skills, including child discipline, budgeting and meal preparation. Mandy was placed in foster care in September 1997, and these parent aide services started soon thereafter. They were continued until February 1999, when they were terminated because Sharon was unwilling to meet with the social workers and was unwilling to cooperate with the requirements of the program. Three different parent aides worked with Sharon to improve her parenting skills during this lengthy period of time. When, however, Mandy was returned to Sharon's home in September 1998, the same problems, such as lack of supervision, not providing adequate food, and development of untreated head lice, reoccurred. The substantial assistance efforts were unsuccessful, and Sharon did not acquire sufficient skills to be able to provide minimally acceptable basic care for Mandy. Thereafter Sharon refused to talk to the social service workers until December 31, 1998. Visitation with Mandy at the Family Safety Center was commenced in January 1999, but Sharon refused parent aide services. In June 1999, Sharon moved to Grafton and it was not until mid July 1999 that she made contact again. The petition for termination of parental rights was filed August 2, 1999, and parental aid services were not offered thereafter.

[¶ 20] While the federal law requires legitimate efforts to prevent the breakup of an Indian family, it does not impose upon social service agencies a duty to persist in efforts that can only be destined for failure. *See, e.g., People in Interest of P.B.*, 371 N.W.2d 366, 372 (S.D. 1985). Dr. Athey testified the prognosis for Sharon developing adequate parenting skills is very poor, even with social service workers providing considerable assistance and educational efforts. The record evidence shows Sharon became uncooperative with the social workers' efforts to enhance her parenting skills. Parental cooperation, or a lack thereof, is a pertinent factor in determining whether a child's deprivation will continue. *See In re A.M.*, 1999 ND 195, ¶ 7, 601 N.W.2d 253; *In Interest of L.F.*, 1998 ND 129, ¶ 17, 580 N.W.2d 573.

[¶ 21] Having carefully reviewed this record, we conclude there is clear and convincing evidence Burleigh County Social Services has for an extended period of time undertaken active efforts to provide remedial services and rehabilitative programs for Sharon to prevent permanent removal of Mandy from her home and those efforts have proved unsuccessful.

### IV

### A

[¶ 22] Sharon asserts the trial court did not comply with 25 U.S.C. § 1912(f), because the court did not qualify any witnesses as experts on Indian-related matters such as Indian customs, tradition, and culture. Under 25 U.S.C. § 1912(f), evidence that the continued custody of the child by the Indian parent would likely result in serious emotional or physical damage to the child must include testimony of "qualified expert witnesses." The Indian Child Welfare Act does not define a qualified expert witness. However, the United States Department of Interior, the Bureau of Indian Affairs, has prepared guidelines on this issue:

(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.

44 Fed.Reg. 67593, § D.4.(b). The Commentary to the guidelines further explains:

The party presenting an expert witness must demonstrate that the witness is qualified by reason of educational background and prior experience to make judgments on those questions that are substantially more reliable than judgments that would be made by non-experts.

· The second subsection makes clear that knowledge of tribal culture and childrearing practices will frequently be very valuable to the court. Determining the likelihood of future harm frequently involves predicting future behavior—which is influenced to a large degree by culture. Specific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm.

The guidelines recognize as a qualified expert witness any professional person who has substantial education and experience in the area of that person's speciality, regardless of whether that professional has specific experience or knowledge of Indian customs, tradition, and culture. A number of courts have concluded that when cultural bias is not implicated in parental termination proceedings, the requirement of qualified expert witness testimony under 25 U.S.C. § 1912(f) can be met by testimony of an expert witness who does not possess special knowledge of Indian life. *L.G. v. State*, 14 P.3d 946, 953 (Alaska 2000); *Matter of N.L.*, 754 P.2d 863, 868 (Okla.1988); *State ex rel. Juvenile Department v. Tucker*, 76 Or.App. 673, 710 P.2d 793, 799 (1985); *see also In re Interest of C.W.*, 239 Neb. 817, 479 N.W.2d 105, 112 (1992); *D.W.H. v. Cabinet for Human Resources*, 706 S.W.2d 840, 843 (Ky.App. 1986); *Matter of Kreft*, 148 Mich.App. 682, 384 N.W.2d 843, 848 (1986).

▮▮▮ [¶ 23] This case clearly does not implicate cultural bias. Racial traditions are not implicated in allegations that a parent has failed to provide a very young child adequate food, basic daily hygiene, and supervision. The Indian Welfare Act was not intended "as a shield to permit abusive treatment of Indian children by their parents" or to allow Indian children "to be abused, neglected, or forlorned under the guise of cultural identity." *Matter of S.D.*, 402 N.W.2d 346, 351 (S.D.1987).

### B

[¶ 24] The primary expert witnesses in this case were Barb Stegmiller and Dr. Richard Athey. Stegmiller has been a licensed social worker for 16 years and has worked for Burleigh County Social Services for eight years. Stegmiller testified that she is familiar with Indian customs, traditions, and culture. Dr. Richard Athey is a medical doctor with a Ph.D. degree in physiology and pharmacology. He is board certified in both adult psychiatry and child and adolescence psychology and he practices "mostly child adolescent psychology." These are skilled and experienced professionals in child custody matters.

[¶ 25] Sharon's attorney did not object to the lack of qualification of the petitioner's expert witnesses. The Yankton Sioux Tribe's attorney, Rochelle Ducheneaux, did not raise any objection to the testimony

presented at the hearing, and she told the court the Tribe did not oppose the termination of parental rights. At the close of the hearing, the court asked Ida Ashes, an Indian Child Welfare Specialist for the Yankton Sioux Tribe, if she wanted to offer any comments, to which she responded, in part, "[W]e do not oppose the termination." Ms. Ashes did not voice any concern to the court that cultural bias was implicated in these proceedings. Under these circumstances, we conclude the testimony of Barb Stegmiller and Dr. Athey meets the requirement of qualified expert witness testimony under 25 U.S.C. § 1912(f).

V

[¶ 26] The order terminating Sharon's parental rights to Mandy is affirmed.

[¶ 27] GERALD W. VANDEWALLE, C.J., and CAROL RONNING KAPSNER, DALE V. SANDSTROM, WILLIAM A. NEUMANN, JJ., concur.