2004 ND 25

**In the Interest of J.P. and D.P., Children**

**Ruby Knoll, L.S.W., Petitioner and Appellee**

**v.**

**K.B., Respondent and Appellant**

**P.P., J.P., D.P., Three Affiliated Tribes, and Monty Mertz, Guardian ad Litem, Respondents.**

**Nos. 20030117, 20030118.**

Supreme Court of North Dakota.

Jan. 28, 2004.

Susan Lynne Bailey, Assistant State's Attorney, Cass County Social Services, Fargo, N.D., for petitioner and appellee.

Douglas W. Nesheim, Fargo, N.D., for respondent and appellant.

KAPSNER, Justice.

[¶ 1] K.B. appeals a juvenile court order affirming a juvenile court referee's order terminating her parental rights with respect to J.P. and D.P. We affirm.

## I

[¶ 2] K.B. is the mother and P.P.[1] is the father of J.P. and D.P., who are Indian children born in 1997 and 1998. In April 2001, K.B. and P.P. admitted the children were deprived and a juvenile court referee found they were deprived, due to a history of child protection involvement since 1997, chemical dependency of both parents, whose chemical use had been detrimental to the children, and K.B.'s conviction of a violent crime and resulting incarceration. The children were placed in the legal custody of Cass County Social Services and in the physical custody of P.P. Both parents were ordered to cooperate with treatment plans.

[¶ 3] In July 2001, the proceedings were transferred to Three Affiliated Tribes. P.P. returned care of the children to K.B. in August 2001. The children were removed from K.B.'s care on October 25, 2001. In an order issued January 18, 2002, a juvenile court referee again found the children were deprived, ordered the children "removed from their own home and placed into the full care, custody and control of the County Director of the Cass County Social Services Board," and ordered the parents to comply with treat-

ment plans in an effort to reunite them with the children. On February 4, 2002, K.B.'s probation was revoked and she was incarcerated.

[¶ 4] On May 31, 2002, Ruby Knoll, an employee of Cass County Social Services, filed a petition for termination of the parental rights of K.B. and P.P. with respect to J.P. and D.P. After a hearing, a juvenile court referee found, among other things:

5. The children ... have been most recently in foster care continuously since October 25, 2001. [J.P.] and [D.P.] have been in foster care for more than 450 of the previous 660 nights.

    . . . .

7. Numerous family service plans to remedy the deprivation [were] developed with the mother and the father by Cass County Social Services toward the goal of reunification. Parents' compliance or progress has not been satisfactory. Active efforts have been made to reunify these children with their parents.

    . . . .

10. There is clear and convincing evidence that [J.P.] and [D.P.] are deprived children in that [K.B.] is currently incarcerated and unavailable to parent the children, that [K.B.] has mental health, chemical dependency, and anger/behavior/domestic violence issues that have not been satisfactorily resolved and which currently and in the foreseeable future adversely affect her ability to adequately parent the children ... this depriva-

---

1. The order also terminated the parental rights of P.P., but he is not a party in this appeal.

tion is likely to continue; and that the deprivation will continue to cause harm to the child.

. . . .

12. There is clear and convincing evidence that Ward County Social Services, Cass County Social Services, and Three Affiliated Tribes' Social Services have provided services to the parents in an attempt to remedy the causes of the deprivation, that these attempts have not only been active and reasonable, but have exhausted all that is available and appropriate. That there is no basis to believe that there will be any significant improvement in the ability of the parents if given more time. That it is likely that the causes of the deprivation will not end and cannot be remedied in a time frame that is reasonable to make these children wait.

13. The state has proven, by clear and convincing evidence, all of the necessary elements for the termination of parental rights of the parents [K.B.] and [P.P.] with respect to [J.P.] and [D.P.].

14. The state has proven beyond a reasonable doubt that the continued custody of the children, [J.P.] and [D.P.], by [K.B.] and/or [P.P.] will likely result in serious emotional or physical damage to the children.

[¶ 5] On February 14, 2003, the juvenile court referee ordered termination of K.B.'s parental rights with respect to J.P. and D.P. K.B. requested judicial review of the referee's order. On March 18, 2003, the juvenile court issued an order affirming the referee's order. K.B. appealed, contending (1) the petitioner failed to prove by clear and convincing evidence that the deprivation was likely to continue;

(2) the evidence does not support the finding that there is no reasonable doubt the children would likely suffer harm if her parental rights were not terminated; (3) there was not clear and convincing evidence that active efforts were made to preserve this Indian family; and (4) the district court erred in deciding termination was justified because the children had been placed outside their home for 450 of the previous 660 nights.

## II

[¶ 6] Section 27–20–44(1)(b), N.D.C.C., authorizes the juvenile court to terminate a person's parental rights with respect to a child, if:

The child is a deprived child and the court finds:

(1) The conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm; [or]

(2) The child has been in foster care, in the care, custody, and control of the department, or a county social service board ... for at least four hundred fifty out of the previous six hundred sixty nights.

Section 27–20–02(8)(a), N.D.C.C., defines a deprived child as a child "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." Because J.P. and D.P. are Indian children, the parental termination proceeding is also subject to 25 U.S.C. § 1912, a part of the Indian Child Welfare Act, which provides, in part:

*(d) Remedial services and rehabilitative programs; preventative measures*

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

. . . .

*(f) Parental rights termination orders; evidence; determination of damage to child*

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

[¶ 7] Those state and federal provisions create a dual burden of proof for a party seeking to terminate the parental rights of a parent of an Indian child. *In re M.S.*, 2001 ND 68, ¶ 4, 624 N.W.2d 678. "Under N.D.C.C. § 27–20–44(1)(b)(1) the juvenile court may terminate parental rights if a child is deprived, the conditions and causes of the deprivation are likely to continue, and the child is suffering, or will in the future probably suffer serious physical, mental, moral, or emotional harm." *In re D.Q.*, 2002 ND 188, ¶ 19, 653 N.W.2d 713. A party seeking termination of parental rights must prove all the necessary elements by clear and convincing evidence. *Id.* Under 25 U.S.C. § 1912(d), a petitioner must demonstrate, "by clear and convincing evidence that active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and those efforts were unsuccessful." *In re M.S.*, at ¶ 18. Under 25 U.S.C. § 1912(f), a petitioner must prove continued custody of a child by a parent or Indian custodian is likely to result in serious emotional or physical damage to the child by proof beyond a reasonable doubt. *Id.* at ¶ 4.

[¶ 8] " 'A judicial referee's conclusions of law are fully reviewable in the district court, and the district court's conclusions of law are fully reviewable upon appeal to this Court.' " *In re A.B.*, 2003 ND 98, ¶ 4, 663 N.W.2d 625 (quoting *In re D.Q.*, 2002 ND 188, ¶ 8, 653 N.W.2d 713). Under N.D.C.C. § 27–50–56, our review of a juvenile court's order is similar to a trial de novo. *In re A.B.*, 2003 ND 98, ¶ 4, 663 N.W.2d 625, *petition for cert. filed*, 72 USLW 3393 (2003). We independently review the evidence, affording the juvenile court's findings appreciable weight, although we are not bound by them. *Id.*

III

[¶ 9] K.B. contends there is not clear and convincing evidence the deprivation was likely to continue or that active efforts were made to preserve this Indian family, and she contends the determination that continued custody of the children by K.B. was likely to result in serious emotional or physical damage to the children was not supported by evidence beyond a reasonable doubt. We reject K.B.'s contentions.

[¶ 10] Jane Austenson, a domestic violence counselor, testified: (1) In April 2001, she did an assessment of K.B. and recommended "extensive and intensive therapy"; (2) "Without extensive, intensive counseling and therapy [domestic violence and assaultive behavior] will not change"; and (3) "[O]ur program for domestic vio-

lence counseling is a minimum of twenty four weeks, two hours a week."

[¶ 11] Ruby Knoll, a licensed social worker for Cass County Social Services, testified: (1) She has "been the case manager while the children have been in foster [c]are"; (2) The children first came into foster care in March of 2001, when K.B. "became intoxicated and hit a parked car, resulting in her being put in jail"; (3) K.B. was placed on probation; (4) "When she got out of jail she maintained semi-regular visitation" between March and July of 2001; (5) On October 25, 2001, KB. "had been involved in a domestic violence situation ... and she was incarcerated"; (6) Between October 25, 2001, and April 5, 2002, K.B. had three visits with the children; (7) There were no more face-to-face visits at the James River Correctional Center after April 5, 2002, because "[t]he children's therapist recommended because of their behavior that was exhibited in therapy sessions as well as in the foster homes that no further face to face visits at that time take place"; (8) It is very rare for a person to address chemical dependency issues without assistance or programing; (9) J.P. and D.P. have been in custody of Cass County Social Services continuously since October 25, 2001; and (10) "It was just difficult to work with K.[B.], because she was not always forthright."

[¶ 12] Sandra Webster, a licensed addiction counselor, testified she did a chemical dependency evaluation of K.B. on April 10, 2001, and worked with her until June 26, 2001. She testified K.B. "has an addiction here with cannabis dependence, cocaine dependence in remission, alcohol dependence and nicotine dependence. And there was also a prior diagnosis of major depressive disorder" and "also a couple of personality disorders that was diagnosed, anti-social personality disorder, avoidance disorder."

[¶ 13] Holly Hegstad, a clinical psychologist, testified: (1) "I conducted psychological testing and review and history of collateral interviews. I wasn't able to finish the interview portion of the evaluation" because K.B. missed an interview and didn't reschedule; (2) "[I]f you want to find out if an individual is going to be able to follow through in treatment you look at their treatment history"; (3) For K.B. "to be able to be the sole custodial parent of her small children," would require "complet[ing] the treatment that she had not completed, psychiatrically following through with the medication ... [f]ollowing through with the addiction after care ... [f]ollowing through with the parenting issues with social services so she can improve her parenting skills," and "addressing the anger so she can learn how to communicate in conflicts without reverting to violence or passive/aggressive behaviors"; and (4) "[F]or most people incarceration is a very different experience than trying to maintain sobriety and manage the responsibilities of life outside of jail or prison."

[¶ 14] Rachelle Wallick, who became K.B.'s probation officer on September 18, 2000, when K.B. was on probation for aggravated assault, testified: (1) K.B. also was convicted of disorderly conduct on July 24, 2000, in a domestic violence incident; (2) "Following through with probation requirements was really not something that was of a high priority to her.... [S]he would not attend any anger management sessions of assault resolution.... She also stated she was involved in a jobs program at social services, but wasn't looking for any employment"; (3) She was arrested in Cass County for driving under the influence of alcohol on March 3, 2001; (4) Between June 2000 and

March 30, 2001, K.B. did not complete a chemical dependency evaluation, although that was one of the conditions of her probation; (5) Between March 30 and July 25, 2001, K.B. did complete a chemical dependency evaluation; (6) From the time she got out of prison in June of 2000, until June 2001, K.B. "made very little to no progress on the terms of her probation"; (7) On October 25, 2001, K.B. was arrested for disorderly conduct arising from a domestic dispute with her brother while they were consuming alcohol; and (8) After a probation revocation hearing on February 4, 2002, K.B.'s probation was revoked and she was remanded to the Department of Corrections for two years.

[¶ 15] Noreen Hoots, a Cass County Social Services licensed social worker, testified: (1) She was involved with K.B. from March 2001 to June 2002; (2) There was a treatment plan in place from July through October 2001, but K.B. "was very uninvolved with social services"; and (3) K.B. was being provided the following services in the summer and fall of 2001:

> She would attend [chemical dependency] treatment at Southeast two times a week beginning July 2nd ... she would undergo intensive individual therapy with Southeast on a weekly basis ... that she would work with a parent aide with Cass County Social Services on a regular basis in regards to parenting education, demonstrating and learning proper parenting techniques involving home rules ... and she would participate in a parental capacity.

K.B. failed to follow through with the services.

[¶ 16] Bonnie Erickson, a case manager in the alcohol and drug unit at Southeast Human Services and a licensed social worker, testified: (1) From July 2001 until December 2001, she co-facilitated a relapse prevention group K.B. was in; (2) Relapse prevention groups met two days a week and people were expected to attend every meeting; (3) K.B. attended 10 of 23 group sessions from July 2001 through December 2001; and (4) K.B. did not "successfully complete relapse prevention."

[¶ 17] Denise Duke, a licensed psychologist, testified she has worked as a therapist for J.P. and D.P. since February 2002, meeting with them at least every two weeks. Duke testified: (1) She did an assessment of J.P. when J.P. was 4 years and 9 months old, and found "factors of depression, anxiety and thought confusion were in the clinical range"; J.P. "tends to be, needs to be bossier, in control of the situation," with "sometimes quite a bit of pouting and difficulty, irritability, moodiness at times, explosiveness" and J.P. "would kind of scream at the top of her lungs if either an adult or even the brother didn't respond fairly quickly to her. And that level of screaming again is somewhat immature and unusual for a child her age"; (2) J.P. "needed a very consistent and stable home life situation"; (3) J.P. likely has experienced post-traumatic stress disorder and a reactive-attachment disorder; and (4) "[S]he will continue to need fairly intensive work ... in the area of both post-traumatic disorder, as well as the reactive attachment disorder. And also in regards to the mood disorder.... I would likely perceive her needs through adulthood."

[¶ 18] Duke testified she assessed D.P. when he was about 3½ years old, finding D.P. "was extremely cautious, guarded" and "serious for a child his age," and "had kind of this blood curdling scream" if he did not get his way, was "aggressive in his interactions" and "has had quite a significant difficultly in day care settings and with other children." She diagnosed D.P. with "mood disorder, not otherwise specified, with anxiousness and depressed fea-

tures ... reactive attachment disorder, inhibited type," and "post traumatic stress disorder." She further testified:

In regard to D.[P.] ... its more likely or its likely that mood difficulties and even explosive behaviors and other difficulties will likely follow him into his elementary school year, likely into adolescence ... there is going to need to be intensive attachment disorder work for him.... And that I would imagine he could also be a candidate who would need to have psychiatric follow through. And there are children with this background at such an early age it isn't unusual that sometime in their lives as either a child or adolescen[t] they could end up needing inpatient hospitalization or residential treatment. So we would need to expect that there is a, that he and J.[P.], are actually both at high risk for the need for fairly intensive work throughout their childhood.

Duke testified J.P. and D.P. would be harmed by a return to an unstable environment; and "it would be to the children's advantage to remain currently in their setting and establish further stability and consistency in their treatment."

[¶ 19] Ruth Denton–Graber, K.B.'s primary therapist from August 2000 until August 2001, at Southeast Human Services Center, testified: (1) K.B. met with a psychiatrist, but only for medication management, not therapy; (2) "Over the period of a year we had nine appointments scheduled. She attended four of them. She attended two additional ones, but her children were along, and its very difficult to do therapy with children present"; and (3) Throughout her relationship with K.B., K.B. did not successfully address any issues.

[¶ 20] Joelyn Foote, who is employed by the Three Affiliated Tribes Social Services Program, and is the Indian Child Welfare Act Specialist, testified: (1) The Tribe was first notified of custody issues involving the children in 2000 in Ward County; (2) In March of 2001, the Tribe intervened in foster care proceedings in Cass County; (3) When a new proceeding was started in Cass County, the Tribe did not move to intervene; (4) The Tribe has been satisfied with the children's placement; (5) "The patterns of behavior of the parents, and the child rearing" are not "consistent with approved traditions or customs of the Tribe."

[¶ 21] Renae Rousseau, a former Tribal Judge and retired Director of the Child Protection Program for the Sisseton–Wahpeton Sioux Tribe, testified: (1) She was first asked to be a consultant on this case in June 2002; (2) She did an independent investigation, reviewed documents, and heard the testimony in this proceeding; (3) "Cass County Social Services made active efforts to provide remedial services to the parents, in accordance with ICWA"; (4) The parents have not "availed themselves of all the services offered to them," and "to effectuate a reunification there would have to be efforts made on the part of the parents"; (5) The behavior of the parents did not comport with Tribal customs; (6) Returning custody of the children to K.B. "is likely to result in serious emotional harm to the children"; (7) "These children need to be in a stable home environment. I[] believe if they were returned to the parents that the trauma they have been exposed to will continue.... And because its not our tradition, its not in our culture to victimize and traumatize our children"; (8) These parents have been provided ample opportunities to address their issues and shortcomings as parents and have not demonstrated that they are willing to work on their addictions and put the children ahead of their addictions; and (9) The

parents have not had any sustained follow through with any of the programs.

[¶ 22] K.B. testified: (1) Her maximum release date from incarceration is January 24, 2004; (2) She has completed an anger management class and is in a domestic violence and survivor's group; (3) The anger management class she completed was 8 or 10 weeks and was required by her sentencing; (4) She is currently in a domestic violence program; (5) "I have a diagnosed avoidance personality disorder. I have major depressive disorder and anti-social personality disorder. I have anxiety problems"; and (6) She is in a domestic violence program dealing with perpetrators.

[¶ 23] Thus, there was evidence about K.B.'s conduct and incarceration, evidence about existing harm sustained by the children and their present needs, prognostic evidence relevant to determining the likelihood of the children's continuing deprivation in K.B.'s care, prognostic evidence about the children's future treatment needs, evidence about unsuccessful efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of this family, and evidence about the likelihood of serious emotional or physical harm to the children with continued custody by K.B. Those kinds of evidentiary subjects are relevant considerations in a proceeding to determine if an individual's parental rights should be terminated. *See, e.g., In re D.Q.*, 2002 ND 188, 653 N.W.2d 713; *In re M.S.*, 2001 ND 68, 624 N.W.2d 678.

[¶ 24] We conclude there was clear and convincing evidence "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful," 25 U.S.C. § 1912(d), and "[t]he conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child[ren][are] suffering or will probably suffer serious physical, mental, moral, or emotional harm," N.D.C.C. § 27–20–44(1)(b)(1). We further conclude the foregoing evidence supports the referee's determination "[t]he state has proven beyond a reasonable doubt that the continued custody of the children" by K.B. "will likely result in serious emotional or physical damage to the children," as required by 25 U.S.C. § 1912(f).

## IV

[¶ 25] In light of our conclusions that unsuccessful active efforts to prevent the breakup of the Indian family were made and the deprivation was likely to continue were proved by clear and convincing evidence, and that K.B.'s continued custody of J.P. and D.P. will likely result in serious emotional or physical damage to the children was proved by evidence beyond a reasonable doubt, we need not determine if the juvenile court erred in determining termination of K.B.'s parental rights with respect to J.P. and D.P. was justified under alternative grounds because the children had been placed outside K.B.'s home for 450 of the previous 660 nights.

## V

[¶ 26] The juvenile court order affirming the juvenile court referee's order terminating K.B.'s parental rights with respect to J.P. and D.P. is affirmed.

[¶ 27] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, WILLIAM A. NEUMANN, and DALE V. SANDSTROM, JJ., concur.