

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| IN THE INTEREST OF S.J.H., A Child. | § § § § § § § | No. 08-19-00182-CV Appeal from the 65th District Court of El Paso County, Texas (TC# 2017DCM7953) |

**O P I N I O N**

This is a parental rights termination case implicating the Indian Child Welfare Act. S.J.H. is the daughter of D.B. (Mother) and N.K.H. (Father). Father, who claimed Indian ancestry through three tribes, voluntarily relinquished his parental rights to S.J.H. and is not a party to this appeal. Mother, who does not claim Indian ancestry, had her parental rights to S.J.H. involuntarily terminated following a bench trial. She appealed the termination order to this Court.

On appeal, Mother contends that the trial court erred procedurally by terminating her parental rights without first definitively determining whether S.J.H. qualified for tribal membership and without following the procedures and standards required by the Indian Child Welfare Act. Mother also argues that even if the Indian Child Welfare Act does not apply, the

trial court erred substantively by finding grounds for termination, by finding that termination was in S.J.H.'s best interest, and by failing to allow one of Mother's relatives to intervene in the custody proceedings.

We will reverse the judgment of the trial court and remand for further proceedings.

**BACKGROUND**

In October 2017, shortly after S.J.H. was born, the Texas Department of Family and Protective Services (the Department) began investigating allegations that Mother was neglectfully supervising S.J.H. due to Mother's postpartum depression and use of marijuana. The Department also received information that Mother was having dreams of harming S.J.H.

In an affidavit, Carmelo Morales attested that during a home visit on October 25, 2017, he made contact with Father and Mother. According to Morales, the home was "filthy with piles of dirty clothes scattered throughout the living area, the dining area and other parts of the home. There were dishes, containers of various sorts and other household items scattered and cluttered throughout the home." Father and Mother disclosed marijuana use, with Mother smoking marijuana two days before the home visit to calm down because the baby was crying, and she did not know what to do. Morales attested that Father disclosed that Mother had smoked marijuana when she was six months pregnant. Mother was referred to both inpatient and outpatient mental health treatment after making statements that she had thoughts about hurting her newborn daughter and for severe cannabis use disorder, but Mother did not comply. Mother and Father were asked to obtain Medicaid, food stamps, and WIC during the course of the investigation, but they did not comply, leaving S.J.H. without medical care. S.J.H. did not have her two-month checkup and was not immunized.

During a November 20, 2017, home visit, Morales reported that Mother and Father were

2

yelling, screaming, and cursing at one another while S.J.H. was crying; Morales stated that he asked them several times to stop and told Mother to pick up S.J.H. and comfort her. On November 28, 2017, the Department received new allegations in a second intake that Mother had not been taking care of S.J.H., that S.J.H. smelled of urine and body order, that she had a very red rash under her neck, that she had not been bathed in days, that her clothes were soaking wet and not properly washed, and that the baby bottles were not properly washed. Both Father and Mother stated that they were not from Texas and did not have relatives or friends they could rely on for help. Mother stated that Maternal Grandmother could not financially take in another child and that Maternal Grandfather had kicked her out of his home. Father stated he did not get along with Paternal Grandmother and that she was not an option for placement.

Following this investigation, the Department removed S.J.H. from the home; filed an original petition for protection of a child, for conservatorship, and for termination in a suit affecting the parent-child relationship in November 2017; and was named S.J.H.'s temporary sole managing conservator.

On January 8, 2018, the trial court ordered Mother to complete a service plan developed by the Department in order to regain custody of S.J.H. The Department's original service plan for Mother required her to: (1) complete a psychiatric evaluation and follow all recommendations; (2) submit to random drug and alcohol testing as requested by the Department, with a failure or refusal to submit regarded as a positive test result; (3) participate in parenting classes and provide a certificate of completion; and (4) complete an OSAR substance abuse evaluation and follow all recommendations.

Two days after the trial court issued the order implementing the service plan, on January 10, 2018, the Department filed a status report indicating that S.J.H. may be an Indian child

3

as reported by Father, and that S.J.H.'s Indian child status was yet to be determined. On March 14, 2018, the Department sent notice to the Bureau of Indian Affairs the S.J.H.'s tribe could not be located or determined. On May 10, 2018, the Department filed a permanency report to the trial court that again identified S.J.H. as a possible Indian child. The permanency report also detailed incidents of Mother's alleged noncompliance with the family reunification order. The CASA report stated that Mother and Father were homeless, did not have reliable transport, and did not complete psychological evaluations, but that Mother was visiting and interacting with S.J.H.

On May 22, 2018, the Department filed a first amended petition for child protection, conservatorship, and parental rights termination noting that Father had executed a voluntary relinquishment of his parental rights and that the Department would serve required notices of pending custody proceedings involving an Indian child on the proper parties. The Department also asked the trial court to make findings under the terms of the ICWA. The Department amended its petition a second time on October 3, 2018, but still requested termination pursuant to the terms of the ICWA. With respect to Mother, the Department sought involuntary termination of parental rights on two grounds: TEX.FAM.CODE ANN. §§ 161.001(b)(1)(O)(failure to comply with provisions of a court order specifically establishing actions necessary to obtain return of the child), and 161.001(b)(1)(P)(use of a controlled substance in a manner that endangered the health or safety of the child and noncompliance with treatment).[1] It is uncontested that this was the live pleading at issue in this case.

At a final hearing on November 9, 2018, at which the trial court terminated Father's rights following Father's agreement to voluntarily relinquish his rights, Department caseworker Rosalva

---

[1] The Department also raised Section 161.001(b)(1)(D) and (E) as grounds, but these were abandoned at the final hearing.

Miranda testified that Father informed her he may be a member of the Blackfoot tribe and the Cherokee tribe. When asked if the Department sent out notices of inquiry to those tribes seeking to find out if the child was a member of that tribe, Miranda responded, "[t]hat's correct." The exhibit volume shows that notices went out return-receipt requested to numerous tribes and entities including:

- The Blackfeet Tribe of Montana/Blackfeet Nation;[2]

- The Chippewa Cree Tribe of the Rocky Boys;

- The Minnesota Chippewa Tribe;

- The Chiricahua Apache NDE Nation;

- The BIA's Rocky Mountain Regional Director; and

- The BIA's Albuquerque Regional Director.

However, there is no evidence in the record showing that notice was sent to Cherokee tribal officials, and as we explain below in the Discussion section, the Department in its brief on appeal does not contest Mother's assertion that notice did not go out to Cherokee officials. The transcript from Father's final termination hearing indicates that at the time Father's rights were terminated, S.J.H. was living with a foster family.

On January 10, 2019, R.C.-1 and R.C.-2 (the Foster Parents) filed a petition to intervene in this suit and be named sole managing conservators.

In April 2019, the Department filed another service plan for Mother. The service plan stated that Mother had not complied with the requirements to start or complete parenting classes and to complete a psychiatric evaluation, nor had she consistently submitted to requested drug tests or completed drug treatment. On June 3, 2019, the Department filed another permanency report

---

[2] The Blackfeet Tribe responded that S.J.H. was not a member.

5

stating that Mother denied that S.J.H. was an Indian child.

On June 6, 2019, Mother's aunt S.P. also filed a petition to intervene in this suit.

The final hearing for Mother was held on June 14, 2019. At the hearing, counsel for Mother stated on the record that she signed an affidavit of relinquishment that directed custody of the child to S.P. as the adoptive parent. Counsel for S.J.H.'s foster parents objected to Mother's Aunt's intervention. The Department also stated that it was not in agreement with S.P. intervening and that it intended to proceed forward with termination on grounds O and P. The trial court granted the objection to the intervention and did not let S.P. intervene in the proceedings. The Court also refused to accept Mother's relinquishment of parental rights.

The sole witness at Mother's termination hearing was Department caseworker Jennifer Martinez. Martinez testified that S.J.H. was close to two years old at the time of the final hearing. According to Martinez, Mother submitted to an OSAR assessment in November 2017 and received recommendations to do inpatient services. She engaged in the services in the beginning, but did not complete them, and was discharged in March 2018 due to noncompliance. When Martinez was assigned to Mother's case in December 2018, Martinez informed Mother about reengaging in the service process, but Mother gave various responses, including that she could not go, she had transportation issues, and that she owed them money, though Martinez testified that the Department would cover costs for the services.

Martinez testified that S.J.H. was bonded to her foster parents, called her foster parents Mom and Dad, and that the foster family provided a loving home that met her physical and emotional needs. Martinez further testified that Mother could not provide that environment for S.J.H. as that point because she needed to address her mental health and substance abuse issues, and she did not show a desire to bond with S.J.H.

6

The trial court ordered termination of Mother's parental rights, finding by clear and convincing evidence to support termination on Section 161.001(b)(1)(O) and (P) grounds. The Department was named S.J.H.'s managing conservator.

This appeal from Mother followed.

## DISCUSSION

Mother raises seven issues on appeal. In Issues One, Two, and Three, S.J.H. maintains that the trial court erred by failing to inquire whether S.J.H. was an Indian child for purposes of the ICWA, failing to notify proper tribal authorities about the existence of these child custody proceedings, and failing to apply the beyond a reasonable doubt evidentiary standard required by the ICWA before terminating Mother's rights. In Issues Four, Five, and Seven, Mother argues that even if the ICWA does not apply, the trial court erred by terminating her parental rights in the absence of clear and convincing evidence showing that she failed to comply with Department service plans and that termination was in S.J.H.'s best interest. Finally, in Issue Six, Mother asserts the trial court erred by not allowing S.P. to intervene when Mother had signed a relinquishment of her parental rights that named S.P. as S.J.H.'s managing conservator.

### *The Indian Child Welfare Act*

We will first discuss whether the ICWA applies in this case, as the ICWA sets out certain procedural steps that must be followed in a custody proceeding involving an Indian child. The ICWA also resets our standard of review in termination cases from clear and convincing evidence to beyond a reasonable doubt. 25 U.S.C.A. § 1912(f);[3] *see also In the Interest of V.L.R.*, 507

---

[3] "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. § 1912.

7

S.W.3d 788, 795 (Tex.App.—El Paso 2015, no pet.)(holding that the *Jackson v. Virginia*[4] beyond a reasonable doubt standard applicable in criminal and juvenile delinquency proceedings applies in ICWA termination proceedings).

The ICWA is a federal law that applies in state court termination cases when a court knows or has reason to know that an Indian child is involved in a child custody proceeding. 25 U.S.C.A. § 1912(f); *In the Interest of V.L.R.*, 507 S.W.3d at 792. Congress enacted the ICWA in 1978 in response to a rising concern over the consequences to Indian tribes, Indian families, and the children of abusive child welfare practices that resulted in the separation of Indian children from their families and tribes. *In the Interest of V.L.R.*, 507 S.W.3d at 792, *citing Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). The Act is based on a policy that, where possible, an Indian child should remain in the Indian community. *Mississippi Band of Choctaw Indians*, 490 U.S. at 36; *In the Interest of V.L.R.*, 507 S.W.3d at 792.

Under the ICWA, an Indian child is defined as any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. 25 U.S.C.A. § 1903(4). An Indian tribe for ICWA purposes means any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians. 25 U.S.C.A. § 1903(8). Texas courts have interpreted this provision to mean that the Indian tribe must be on the list of Native American tribes legally recognized by the Bureau of Indian Affairs. *In the Interest of V.L.R.*, 507 S.W.3d at 793. The ICWA does not establish which persons are considered to be members of a tribe or eligible for membership in a tribe; that determination lies solely with the tribe itself based on the tribe's

---

[4] *Jackson v. Virginia*, 443 U.S. 307, 320 (1979).

internal laws and criteria. *In re J.C.C.*, 302 S.W.3d 896, 900 (Tex.App.—Waco 2009, no pet.).

The ICWA requires the Department to notify relevant tribal authorities when it seeks to terminate the parental rights to a known or suspected Indian child:

> In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. No foster care placement or termination of parental rights proceeding shall be held until at least ten days after receipt of notice by the parent or Indian custodian and the tribe or the Secretary: *Provided*, That the parent or Indian custodian or the tribe shall, upon request, be granted up to twenty additional days to prepare for such proceeding. [Emphasis in orig.].

25 U.S.C.A. § 1912(a).

The ICWA, including the notice requirements, applies to all parental right termination proceedings involving a known or suspected Indian child even where the parental rights to be terminated are those of a non-Indian parent. *See K.N. v. State*, 856 P.2d 468, 474 n.8 (Alaska 1993).

The ICWA's implementing regulations provide guidance with respect to the evidentiary standards used in determining whether a child is an Indian child for purposes of the statute when the record is inconclusive. Specifically, the regulations direct state courts having reason to believe a child is an Indian child to presume the child is an Indian child until proven otherwise:

> (b) If there is reason to know the child is an Indian child, but the court does not have sufficient evidence to determine that the child is or is not an 'Indian child,' the court must:

> > (1) Confirm, by way of a report, declaration, or testimony included in the record that the agency or other party used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership), to verify whether the child is in fact

9

a member (or a biological parent is a member and the child is eligible for membership); and

(2) Treat the child as an Indian child, unless and until it is determined on the record that the child does not meet the definition of an 'Indian child' in this part.

25 C.F.R. § 23.107.

In this case, Father stated that he was a member of the Blackfoot tribe, the Chippewa tribe, and the Cherokee tribe. The Department's own pleadings also identified S.J.H. as a suspected Indian child. These factors triggered the presumption under the ICWA's implementing regulations that S.J.H. was an Indian child, meaning that the ICWA and its procedures apply to the termination proceedings against Mother, the non-Indian parent. *Id*. This presumption holds unless and until it is shown that S.J.H. is *not* an Indian child in fact. 25 C.F.R. § 23.107(b)(2).[5]

The Department contends that, notwithstanding the presumption set by federal regulations, the trial court here was free to find that S.J.H. was not an Indian child and to apply default non-ICWA state termination procedures. We disagree. In disputing S.J.H.'s Indian child status, the Department relies largely on a status report in which Mother denied that S.J.H. was an Indian child. However, the report does not establish on what basis Mother made that assertion or what evidence Mother had contradicting Father's claim of Indian heritage. Additionally, as Mother herself points out on appeal, the Department's own trial court pleadings refer to S.J.H. as a suspected Indian child, and there was never an amendment removing that allegation from the live petition. As such, we do not believe the state of the record and the pleadings in this case are sufficient to overcome

---

[5] The State court may rely on facts or documentation indicating a Tribal determination of membership or eligibility for membership in making a judicial determination as to whether the child is an "Indian child." An example of documentation indicating membership is a document issued by the Tribe, such as Tribal enrollment documentation. 25 C.F.R. § 23.108.

the presumption that S.J.H. is an Indian child.[6]

Once S.J.H. was suspected of having Native American heritage by virtue of her Father's claims of tribal ancestry and by virtue of the Department's own pleadings, she was presumptively an Indian child, meaning that under these circumstances, notification to relevant tribal authorities was required. Father identified two potential tribes through which S.J.H. might claim membership: the Blackfoot tribe and the Cherokee tribe. The Bureau of Indian Affairs' Guidelines for State Courts in Indian Child Custody Proceedings[7] provides further details about what trial courts should do in situations where membership in multiple tribes is suspected:

> When an agency or court knows or has reason to know that the subject of an involuntary child custody proceeding is an Indian child, the agency or court must send notice of each such proceeding (including but not limited to a temporary custody hearing, any removal or foster care placement, any adoptive placement, or any termination of parental or custodial rights) by registered mail with return receipt requested to . . . [e]ach tribe where the child may be a member or eligible for membership.
>
> Department of the Interior Bureau of Indian Affairs Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed.Reg. 10146, 10153-10154 (February 25, 2015).

Here, notification should have gone out to the relevant tribal authorities related to those tribes identified by Father. The record shows that ICWA Notices detailing the child custody

---

[6] The Department is correct that the presumption does not necessarily apply in perpetuity absent a response from tribal authorities. Comments to the federal regulations state, for example, that "[i]f a Tribe fails to respond to multiple repeated requests for verification regarding whether a child is in fact a citizen (or a biological parent is a citizen and the child is eligible for citizenship), and the agency has repeatedly sought the assistance of BIA in contacting the Tribe, a court may make a determination regarding whether the child is an Indian child for purposes of the child-custody proceeding based on the information it has available." 81 Fed.Reg. 38788-01, 38806. But that discretion to make the determination that the Indian child presumption no longer applies presupposes some sort of attempt to contact tribal authorities in the first place. And, as we explain below, it appears from this record that proper notification to tribal authorities was not given, meaning that the Indian child presumption still applies to this case.

[7] Various administrative materials issued by the Bureau of Indian Affairs fill in interstitial gaps in the statute and provide guidance for state courts in interpreting and enforcing the ICWA. For instance, the Bureau of Indian Affairs' Guidelines for State Courts in Indian Child Custody Proceedings do not have binding legislative effect, but we may use and have used them in interpreting the ICWA. *In the Interest of V.L.R.*, 507 S.W.3d 788, 796 (Tex.App.—El Paso 2015, no pet.).

proceedings and stating that the child's tribe could not be determined or located was sent by certified mail to the BIA Rocky Mountain Regional Director,[8] the Blackfeet Nation, the Blackfeet Tribe of Montana,[9] the Chippewa Cree of the Rocky Boys, and the Minnesota Chippewa. An ICWA notice was also sent to the Chiricahua Apache Mimbreno NDE Nation Tribe.[10] In April 2018, the Blackfeet Tribe verified that the child was not a member of eligible for tribe members. The Minnesota Chippewa Tribe also verified the child was not a member of their tribe.

While the record shows that the Department made a broad effort to contact several tribes in this case, the record does not show that—despite Father's claims of Cherokee ancestry—notice ever went out to Cherokee authorities or that Cherokee authorities ever made a determination regarding S.J.H.'s eligibility for tribal memberships. The Department does not dispute that Cherokee officials have not been notified of these proceedings. While a tribe's repeated failure "to respond to multiple repeated requests for verification" of a child's citizenship status after the agency and the BIA have attempted to make contact may result in a trial court rendering an Indian child status determination based on the information it has available, *see* 81 Fed.Reg. 38788, 38806, Indian Child Welfare Act Proceedings (June 14, 2016), the complete failure to contact relevant tribal authorities is another matter entirely.

The failure to contact Cherokee representatives has two implications in this case.

---

[8] The ICWA directs the party seeking termination of parental rights to an Indian child to give notice by registered mail to the Secretary of the Bureau of Indian Affairs "[i]f the identity . . . of the . . . tribe cannot be determined . . . ." 25 U.S.C.A. § 1912(a).

[9] Although a Department caseworker testified that Father claimed he was a member of the "Blackfoot tribe," notice went out to the *Blackfeet* Nation. Mother takes this discrepancy as proof that notice was defective on this point as well, since Father said he had *Blackfoot* heritage, but the notice did not go out to the *Blackfoot* tribe but to the *Blackfeet* tribe. We agree with the Department that the notice requirement was met under these circumstances, since there is no federally recognized "Blackfoot" tribe and the entity that is federally recognized is the Blackfeet Tribe of the Blackfeet Indian Reservation of Montana. *See* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 84 Fed.Reg. 1200, 1201 (Feb. 1, 2019).

[10] It is unclear from the record why Apache authorities were notified.

12

First, on the record before us, S.J.H. is presumptively considered to be an Indian child per federal regulations pending tribal notification and a tribal citizenship decision from Cherokee authorities, meaning that the ICWA, its procedures, and its heightened beyond-a-reasonable-doubt burden of proof apply in this case. The trial court erred by applying the clear and convincing evidence standard in Mother's termination.

Second, the failure to contact Cherokee officials despite Father's claims of Cherokee heritage constitutes the second, separate reversible error appearing in this record. *See* 25 U.S.C.A. § 1914 (court action may be invalidated if ICWA provisions are not met). ICWA procedures require notification to Cherokee officials so that the tribe could send a representative to participate and possibly argue for an Indian Child Welfare Act custody placement for S.J.H. Based on the existence of these two substantive errors, we have no choice but to reverse the termination decision.

We sustain Issues One and Two. We also sustain Issue Three to the extent that Mother complains the trial court used the improper standard of review.

### *Remedy*

Because reversal is required here under the ICWA, the only question remaining is the remedy this Court will order in light of these errors.

The Department urges us to render a merits decision despite the existence of these two reversible errors, pointing us to several decisions in which our sister courts, acting under similar circumstances (1) abated the termination appeals, (2) remanded cases to the trial court so that proper notice could be provided to tribal authorities and the trial court could determine whether the subject children were Indian children, and (3) conditionally affirmed the termination order in the event that the trial court concluded that the subject children were not Indian children. *See, e.g.,*

13

*In re J.C.C.*, 302 S.W.3d at 902; *In re R.R., Jr.*, 294 S.W.3d 213, 226-27 (Tex.App.—Fort Worth 2009, no pet.).

These cases rely on TEX.R.APP.P. 44.4 for the authority to abate and conditionally affirm termination orders pending a decision on Indian child status in the trial court. Rule 44.4 allows an appellate court to direct a trial court to correct an error that prevents the proper presentation of a case to the court of appeals. *See* TEX.R.APP.P. 44.4(b). While we understand the logic behind our sister courts' actions, we believe that reversal and remand is the better course of action here for three reasons.

First, we are concerned that issuing a "conditional" judgment affirming the trial court would create an implicit presumption that the child is *not* an Indian child by treating the failure to contact tribal authorities as a simple procedural error standing in the way of an inevitable affirmance, thereby structuring appellate relief in a manner that may—consciously or not—incentivize a trial court to find that a child is not an Indian child so as to expedite a decision and bring finality to these proceedings.[11] We understand the need to bring finality to these difficult proceedings. But federal regulations make clear that in cases like this one, the courts are to presume that the subject child *is* an Indian child until proven otherwise, and the ICWA makes clear that these uniform procedures and evidentiary standards governing child custody actions in all 50 states must be strictly followed. The trial court must take into consideration serious issues relating to tribal interests at every step of the way until a child is determined not to be an Indian child.

---

[11] It is unclear how Rule 44.4, which gives courts of appeals the authority to direct the trial court to correct a procedural error that prevents the proper presentation of a case on appeal, allows a court of appeals to issue a "conditional" judgment in conjunction with a directive to correct an error. *Compare* TEX.R.APP.P. 46.3 (allowing appellate court to suggest a remittitur in a civil case and then issue a judgment either reforming a damages award or reversing a damages award based on the actions of a litigant). Rule 43.2, which delineates the types of judgments a court of appeals may render, does not mention any general ability to issue "conditional" judgments. While this procedure may be proper, this discrepancy and lack of textual certainty in the rules also gives us pause in using this technique as a remedy here.

14

Thus, the failure to notify Cherokee authorities is not the type of clean-cut error that can be easily corrected under TEX.R.APP.P. 44.4(b) because it potentially "requires more than the determination of perfunctory issues which can be procedurally cured by the trial court entering a clarifying or similar order." *See Garcia v. Commr's Court of Cameron Cty.*, 101 S.W.3d 778, 786 (Tex.App.— Corpus Christi 2003, no pet.)(interpreting Rule 44.4). Matters here are not so simple. Abating the appeal and imposing an expedited timeline for a trial court decision[12] risks preventing full and fair litigation on the issue of S.J.H.'s potential tribal citizenship status. Remand for further proceedings will provide all parties with the opportunity to ensure that the mandates of the ICWA are met on a timeline that makes sense for the parties, the trial court, and Cherokee officials. *Accord S.P. v. Tex. Dep't of Family & Protective Servs.,* No. 03-17-00698-CV, 2018 WL 1220895, at *5 (Tex.App.—Austin Mar. 9. 2018, no pet.)(mem. op.)(remanding for full consideration of evidence).

Second, it would be advisory for us to opine on whether Mother's termination order was supported by legally sufficient evidence under the clear and convincing evidence standard because that is the incorrect evidentiary standard to apply under these circumstances, and it would be inappropriate for us to speculate about whether termination would be supported by sufficient evidence under the clear and convincing evidence standard in the event that S.J.H. is determined *not* to be an Indian child on remand, particularly given the chance that remands allow for the

---

[12] The Texas Rules of Judicial Administration require this Court, as far as reasonably possible, to ensure that an appeal in a suit for termination of the parent-child relationship is brought to a final disposition within 180 days of the date the notice of appeal is filed. *See* TEX.R.JUD'L ADMIN. 6.2(a). The 180th day after the filing date of the notice of appeal in this case falls on December 30, 2019. Abating this case with instructions to the trial court to hold a hearing to determine S.J.H.'s potential tribal citizenship status and to do so within the space of less than a month so that we may resolve this case within the deadline set by Rule 6.2(a) not only creates an institutional incentive to shortcut the ICWA's procedures in the name of expediency, it is also simply not feasible. Remand for further proceedings consistent with this Court's opinion allows this Court to meet its conflicting obligations by bringing this appeal to a final resolution as required by Rule 6.2(a) while still allowing the trial court to exercise its independent judgment free of burdensome administrative time constraints imposed by this Court.

potential presentation of new evidence and we have no idea of what effect future proceedings will have on the record. *See id.* Likewise, it would be advisory for us to opine on whether the evidence would be sufficient to support termination under the beyond a reasonable doubt standard required by the ICWA because the trial court never actually made a determination using that standard. A merits determination under these circumstances would be inappropriate because it is not necessary to the resolution of this appeal; we may reverse and remand based on the use of the incorrect evidentiary standard and the failure to provide notice without needing to address the merits of the decision. *See* TEX.R.APP.P. 47.1 (appellate courts should answer only those issues necessary to the resolution of the appeal). As such, we decline to address Issues Four, Five, and Seven as being unnecessary to the resolution of this appeal. Likewise, we decline to address Issue Six (dealing with the intervention) as being unnecessary to the resolution of this appeal.

Finally, this case involves more than just the termination of Mother's rights. It involves a potential adoption, which implicates core ICWA concerns. *See In re D.D.*, No. 12-15-00192-CV, 2016 WL 1082477, at *7 (Tex.App.—Tyler Feb. 29, 2016, no pet.)(mem. op.)(strict compliance with ICWA in adoption situations is especially important because ICWA permits adoption to later be invalidated if procedures were not followed). Several parties are seeking custody of S.J.H. If the trial court confirms that S.J.H. is, in fact, an Indian child, custody proceedings will be expanded and potentially involve Cherokee authorities, as well. The trial court is better situated to handle the issues that will arise once a final determination about S.J.H.'s status as an Indian child or a non-Indian child is finally settled. *See* TEX.R.APP.P. 43.3 (remand, not rendition, is the preferred remedy when further proceedings are necessary); *S.P.*, 2018 WL 1220895, at *5 (finding that remand was appropriate because in parental right termination cases "appellate courts are not in a position to determine whether simply to deny the petition for termination or render some other

16

order in the best interest of the child")[Internal citations and quotation marks omitted].

For these reasons, we will reverse the trial court's judgment terminating Mother's rights and remand for further proceedings consistent with this opinion. *See id.*

## CONCLUSION

The ICWA applies in this case unless and until notification is given to Cherokee officials and Cherokee officials confirm that S.J.H. is not a member of their tribe, though the trial court has the discretion to determine Indian child status in the event that attempts to contact tribal authorities are unsuccessful and a final citizenship determination from relevant authorities is not forthcoming. So long as the ICWA presumptively applies, the trial court must use the beyond a reasonable doubt standard necessary for termination of the parental rights of an Indian child, even though Mother herself is not a member of a Native American tribe.

The failure to contact Cherokee officials to ascertain S.J.H.'s potential Indian child status and the failure to use the beyond a reasonable doubt standard here were both errors. Because these errors are not perfunctory errors that case be easily corrected by abating and directing the trial court to remedy the errors, remand for further proceedings in the trial court is required.

As such, we reverse the judgment of the trial court as to Mother and remand for further proceedings consistent with this opinion.


December 9, 2019

                                        YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Palafox, J., and McClure, Senior Judge
McClure, Senior Judge (Sitting by Assignment)